[No. B211597. Second Dist., Div. One. Aug. 31, 2011.]

FLAGSHIP THEATRES OF PALM DESERT, LLC, Plaintiff and Appellant,
v.
CENTURY THEATRES, INC., et al., Defendants and Respondents.

1368

1370

COUNSEL

Perkins Coie, Thomas L. Boeder, Jessica E. Eiting and Melora M. Garrison for Plaintiff and Appellant.

Blecher & Collins, Maxwell M. Blecher, David W. Kesselman and Theo G. Arbucci for Defendants and Respondents.

OPINION

**ROTHSCHILD, J.**—This is an antitrust action concerning the distribution and exhibition of motion pictures. Flagship Theatres of Palm Desert, LLC (Flagship), owns a movie theater called the "Cinemas Palme d'Or" (the Palme) with 10 screens. Flagship owns no other theaters. Century Theatres, Inc. (Century), owns a nearby movie theater called the "Century 15 at the River" (the River) with 15 screens. Century owns a large theater circuit of over 1,000 screens, and in 2006 Century was acquired by Cinemark USA, Inc. (Cinemark), resulting in a combined circuit of several thousand screens. Many of Century's theaters are in noncompetitive markets.

Flagship filed this antitrust action against Century and two film distributors, alleging that Century has used the power deriving from both the size of its theater circuit and its many theaters in noncompetitive markets to undermine the competitive process through which theaters bid for and obtain licenses to exhibit first-run films. According to Flagship, under previous ownership the River and the Palme obtained roughly equal numbers of first-run films, but under Century the River now obtains licenses for far more first-run films than the Palme, the few that are left to the Palme are commercially inferior, and the imbalance is not based on the relative merits of the Palme's and the River's bids. On the contrary, according to Flagship, superior bids by the Palme are often rejected in favor of inferior bids by the River as a result of Century's abuse of the power of its circuit.

After Flagship voluntarily dismissed the distributors and amended its pleadings to add Cinemark as a defendant, Century and Cinemark (collectively defendants) moved for summary judgment. They argued, inter alia, that

Flagship could not show antitrust injury and could not show that Century had market power in the market in which the Palme and the River compete. The trial court agreed and entered judgment against Flagship. We reverse.

## BACKGROUND

Flagship operates the Palme, a 10-screen movie theater in Palm Desert, California. Century operates the River, a 15-screen movie theater in the neighboring community of Rancho Mirage, California. The Palme and the River are located less than two miles apart on Highway 111, a major thoroughfare running through the Coachella Valley. Previously, when the Palme and the River were being operated by Flagship's and Century's predecessors, film distributors granted "clearances" to the River and the Palme with respect to each other, meaning that a distributor licensing a film to the River would agree not to license the same film to play at the Palme at the same time, and vice versa.

Century began operating the River in approximately July 2002 and continued its predecessor's practice of requesting clearances for the River with respect to the Palme. Before being acquired by Cinemark in 2006, Century operated movie theaters at 80 locations across 12 states, featuring a total of more than 1,000 screens.[1] Flagship introduced evidence that as of 2006, only approximately 12 to 14 of Century's 80 theaters were in competitive markets.

Flagship's only theater is the Palme, which Flagship acquired in 2003. Two of Flagship's founders previously formed another business entity, Flagship Theatre Corporation, which operates only one theater, located in a noncompetitive market.

In July 2006, Flagship filed the instant lawsuit against Century and two film distributors. The complaint alleged claims for restraint of trade in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.),[2] unfair competition in violation of the unfair competition law (§ 17200 et seq.; hereafter UCL), and intentional interference with prospective economic advantage. Flagship later filed a first amended complaint and a second amended complaint, alleging similar claims and adding Cinemark as a defendant. Flagship also eventually dismissed the distributor defendants.

Flagship alleged that before Century began to operate the River, film distributors licensed roughly equal numbers of first-run films to the River and

---

[1] Flagship introduced evidence that as of June 2008, the resulting Cinemark theater circuit operated theaters with 3,483 screens at 270 locations and was the third largest theater circuit in the United States.

[2] All subsequent statutory references are to the Business and Professions Code unless otherwise indicated.

the Palme, with the Palme "generally receiving the larger share." After Century began operating the River, however, distributors licensed roughly three times as many first-run films to the River as to the Palme, and the films licensed to the Palme were generally "inferior films" that were expected to "generate far lower box office revenue than those licensed to Century." Flagship alleged that Century obtained such favorable treatment for the River, to the detriment of the Palme, by using the bargaining power deriving from both the size of Century's circuit and its operation of numerous theaters in noncompetitive markets. Flagship alleged that Century's conduct constituted unlawful "circuit dealing," which violates the long-standing antitrust law requirement that "films be licensed on a theater by theater, film by film basis."

In 2008, defendants moved for summary judgment. Defendants argued that Flagship's antitrust claim under the Cartwright Act failed because (1) the clearances Century obtained for the River against the Palme were lawful, (2) Century did not have sufficient market power in the geographic market in which the Palme and the River compete—which defendants contended was the entire Coachella Valley—to cause competitive harm in that market, and (3) Flagship could not demonstrate antitrust injury. Defendants further argued that because the Cartwright Act claim failed, Flagship's UCL and intentional interference with prospective economic advantage claims failed as well.

Flagship filed opposition and, in the alternative, requested a continuance in order to complete outstanding discovery. Flagship argued that defendants' motion was based on "the false assumption that this is just a case about clearances" and contended to the contrary that the case is based on Century's methods of negotiating with and licensing films from distributors, which deprived the Palme "of the opportunity to fairly compete to license any but a handful of first-run films."

The trial court granted defendants' motion and entered judgment against Flagship. The court agreed with defendants that Flagship failed to create a disputed issue of material fact regarding (1) antitrust injury, (2) the contention that the geographic market in which the Palme and the River compete is the entire Coachella Valley, and (3) the contention that Century lacks market power in that market. Flagship timely appealed.

## STANDARD OF REVIEW

We review the trial court's ruling on a motion for summary judgment de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

# DISCUSSION

## I. Summary of Principles of Antitrust Law and Overview of Claims

The Cartwright Act states that "[e]xcept as provided in this chapter, every trust is unlawful, against public policy and void." (§ 16726.) Section 16720 defines the term "trust" as "a combination of capital, skill or acts by two or more persons" for certain enumerated anticompetitive purposes, including "[t]o create or carry out restrictions in trade or commerce." (§ 16720, subd. (a).) That prohibition is analogous to the catchall language of section 1 of the Sherman Act (15 U.S.C. § 1), which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 838 [107 Cal.Rptr.2d 841, 24 P.3d 493] (hereafter *Aguilar*).) Thus, although the Cartwright Act was not patterned after the Sherman Act (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1164 [252 Cal.Rptr. 221, 762 P.2d 385], superseded by statute on other grounds as stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086]), federal case law interpreting the Sherman Act is often a useful aid in interpreting the Cartwright Act (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 84 [76 Cal.Rptr.3d 73]).

Under both Cartwright Act and Sherman Act case law, some restraints of trade are treated as per se unlawful, while others are analyzed under the "rule of reason." "In general, only unreasonable restraints of trade are prohibited. [Citation.] However, 'there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' [Citation.] Among these per se violations is the concerted refusal to deal with other traders, or, as it is often called, the group boycott. [Citations.]" (*Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 930–931 [130 Cal.Rptr. 1, 549 P.2d 833] (hereafter *Marin County*).) Under the rule of reason, the challenged conduct is unlawful only if its anticompetitive effects outweigh its procompetitive effects. (See, e.g., *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680–1681 [60 Cal.Rptr.2d 195].)[3]

---

[3] Flagship has also alleged a claim under the UCL. The UCL does not proscribe specific practices. Rather, it defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (§ 17200.)

Because the parties' characterizations of Flagship's claims differ considerably, we briefly summarize them here before turning to analysis of the parties' arguments on the merits. According to defendants, Flagship's claims are essentially challenges to Century's practice of obtaining clearances from film distributors. ("[Flagship] is really complaining about Century's clearance requests.") A clearance is an exclusive right that a film distributor grants to a theater in connection with the licensing of a film. It prohibits the distributor from licensing the film for exhibition at certain other theaters, either identified by name or located within a specified geographic region, while the film is being shown at the theater that obtained the clearance. (See, e.g., *Soffer v. National Amusements Inc.* (D.Conn., Jan. 10, 1996, Civ. No. 3:91CV472 (AVC)) 1996 U.S.Dist. Lexis 19751, p. *6; *Orson, Inc. v. Miramax Film Corp.* (E.D.Pa. 1994) 862 F.Supp. 1378, 1386, fn. 10.) Federal case law applying the Sherman Act has treated clearances as vertical nonprice restraints that are evaluated under the rule of reason.[4] (See *Theee Movies of Tarzana v. Pacific Theatres, Inc.* (9th Cir. 1987) 828 F.2d 1395, 1398 (hereafter *Theee Movies*).) There are no published California cases evaluating the legality of clearances under the Cartwright Act.

According to Flagship, this is a "circuit dealing" case, not a case challenging clearances in the absence of circuit dealing. The case law contains no general definition of prohibited circuit dealing, but it is generally characterized as "the pooling of the purchasing power of an entire circuit in bidding for films," which undermines the competitive process of bidding for film licenses "theatre by theatre." (*United States v. Paramount Pictures* (1948) 334 U.S. 131, 154 [92 L.Ed. 1260, 68 S.Ct. 915] (hereafter *Paramount Pictures*).)

One type of prohibited circuit dealing is a form of monopoly leveraging, that is, "a monopolist's use of power in one market to gain an advantage in a related market." (Sullivan & Grimes, The Law of Antitrust: An Integrated Handbook (2000) § 3.4b1, p. 106.) For example, one of the United States Supreme Court cases concerning circuit dealing addressed certain "master agreements" between distributors and movie theater circuits that "lumped together towns in which the [circuits] had no competition and towns in which there were competing theaters." (*United States v. Griffith* (1948) 334 U.S. 100, 102–103 [92 L.Ed. 1236, 68 S.Ct. 941] (hereafter *Griffith*).) The court explained the anticompetitive character of this kind of circuit dealing as follows: "A [circuit] with a monopoly of theatres in any one town commands the entrance for all films into that area. If [the circuit] uses that strategic position to acquire exclusive privileges in a city where [it] has competitors, [it] is employing [its] monopoly power as a trade weapon against [the

---

[4] Vertical restraints are restraints embodied in agreements between parties at different levels of the distribution chain (for example, between a wholesaler and a retailer).

circuit's] competitors. It may be a feeble, ineffective weapon where [the circuit] has only one closed or monopoly town. But as those towns increase in number throughout a region, [the circuit's] monopoly power in them may be used with crushing effect on competitors in other places. [The circuit] need not be as crass as the exhibitors in *United States* v. *Crescent Amusement Co.* [(1944) 323 U.S. 173 [89 L.Ed. 160, 65 S.Ct. 254]] in order to make [its] monopoly power effective in [its] competitive situations. Though [the circuit] makes no threat to withhold the business of [its] closed or monopoly towns unless the distributors give [it] the exclusive film rights in the towns where [it] has competitors, the effect is likely to be the same where the two are joined. When the buying power of the entire circuit is used to negotiate films for . . . competitive as well as . . . closed towns, [the circuit] is using monopoly power to expand [its] empire. . . . [¶] The consequence of such a use of monopoly power is that films are licensed on a non-competitive basis in what would otherwise be competitive situations." (*Griffith, supra,* 334 U.S. at pp. 107–108.)

█ Another United States Supreme Court case, however, discerned a second and independent basis on which a film licensing agreement that covers multiple theaters within a circuit (i.e., a "circuit deal") can constitute an antitrust violation regardless of whether it involves monopoly leveraging. (*Paramount Pictures, supra,* 334 U.S. at pp. 153–155.) The case discussed certain "formula deals"—namely, "licensing agreement[s] with a circuit of theatres in which the license fee of a given feature is measured, for the theatres covered by the agreement, by a specified percentage of the feature's national gross"—and "master agreements"—namely, film licensing agreements "that cover exhibition in two or more theatres in a particular circuit." (*Id.* at pp. 153–154.) The court explained that "[t]he formula deals and master agreements are unlawful restraints of trade in two respects." (*Id.* at p. 154.) First, the combination of "closed towns" with "competitive situations" constituted "a misuse of monopoly power" (i.e., unlawful monopoly leveraging). (*Id.* at pp. 155, 154.) Second, licensing agreements covering multiple theaters within a particular circuit are unlawful because "they eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." (*Id.* at p. 154.)

Circuit dealing in either of these forms has been held per se unlawful under the Sherman Act (*Paramount Pictures, supra,* 334 U.S. at pp. 153–155; *Griffith, supra,* 334 U.S. at pp. 106–109), but the most recent United States

Supreme Court cases to so hold were decided in 1948.[5] No California Supreme Court case addresses the legality of circuit dealing under the Cartwright Act. The sole California Court of Appeal case on the issue is *Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687 [248 Cal.Rptr. 189] (hereafter *Redwood Theatres*).[6] It acknowledged that the United States Supreme Court held circuit dealing per se unlawful under the Sherman Act but also recognized that both federal antitrust law and the structure of the film industry have undergone considerable development since the late 1940's. (*Redwood Theatres*, at pp. 697–698.) *Redwood Theatres* also recognized that the federal case law distinguishes two grounds for finding circuit dealing illegal, one that involves "misuse of monopoly power" and another that would apply "even where all of the markets within a circuit were competitive." (*Id.* at p. 696.) The court then observed that "[i]n the present case, the issue of abuse of monopoly power is no longer raised." (*Ibid.*) The court proceeded to survey antitrust law in several related areas, including boycotts and vertical restraints, and ultimately concluded that the plaintiff's circuit dealing claim (which was not a monopoly leveraging claim) was subject to rule of reason analysis under the Cartwright Act. (*Redwood Theatres*, at p. 713.)

## II. Antitrust Injury

Our analysis necessarily begins with the grounds on which the trial court granted defendants' motion for summary judgment.[7] The trial court agreed with defendants' argument that Flagship could not show antitrust injury. On appeal, Flagship argues that the trial court erred, and we agree. Defendants'

---

[5] *Griffith* acknowledged that "[l]arge-scale buying is not, of course, unlawful *per se*" and "may yield price or other lawful advantages to the buyer." (*Griffith, supra,* 334 U.S. at p. 108.) But the opinion went on to state that large-scale buying "may not, however, be used to monopolize or to attempt to monopolize interstate trade or commerce. Nor . . . may it be used to stifle competition by denying competitors less favorably situated access to the market." (*Ibid.*) Given the court's per se condemnation of circuit dealing on both the monopoly leveraging theory and the elimination of theater-by-theater bidding theory, we conclude that the court's recognition that not *all* large-scale buying is unlawful per se was not meant to imply that circuit dealing in particular is subject to rule of reason analysis.

[6] Our search of all federal and state court case law found only a handful of cases even potentially touching on the issue. *Redwood Theatres* was the only state court case, and the remaining post-1940's cases contained no useful discussion of the issue.

[7] In general, an appellate court reviews only the trial court's ultimate decision, not the reasoning on which it was based, and we may affirm the decision on any valid theory. (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15–16 [68 Cal.Rptr.2d 837].) In an appeal from a summary judgment, however, we are statutorily prohibited from affirming the judgment on a ground not relied on by the trial court unless we first afford the parties an opportunity for supplemental briefing on the issue. (Code Civ. Proc., § 437c, subd. (m)(2).) Our analysis accordingly focuses at the outset on the trial court's grounds for its decision.

argument is based on a legally erroneous conception of the antitrust injury requirement, so defendants failed to carry their initial burden on the issue.

The antitrust injury requirement originates in a case decided by the United States Supreme Court under federal antitrust law, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477 [50 L.Ed.2d 701, 97 S.Ct. 690] (hereafter *Brunswick*). In that case, the plaintiff bowling alleys challenged the defendant corporation's acquisition of several competitor bowling alleys that otherwise would have gone out of business. The plaintiffs' alleged damages were the profits they had lost by being forced to compete with the acquired bowling alleys. (*Id.* at pp. 480–483.) Thus, the issue presented for review was "whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying [the plaintiffs] an anticipated increase in market shares." (*Id.* at p. 484.)

■ The Supreme Court concluded that antitrust damages are not available under those circumstances. The court described the plaintiffs' case as complaining that by acquiring the failing bowling alleys, the defendant "preserved competition, thereby depriving [the plaintiffs] of the benefits of increased concentration." (*Brunswick, supra*, 429 U.S. at p. 488.) Thus, the damages the plaintiffs sought were "designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for 'the protection of *competition*, not *competitors*,' [citation]. It is inimical to the purposes of these laws to award damages for the type of injury claimed here." (*Ibid.*) Accordingly, the court held that for the plaintiffs to recover damages for antitrust violations, they "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." (*Id.* at p. 489; see generally 2A Areeda et al., Antitrust Law (3d ed. 2007) ¶ 337, pp. 82–96.)

■ *Brunswick* was an antimerger case decided under the Clayton Act (15 U.S.C. § 12 et seq.), but subsequent federal case law makes clear that the antitrust injury requirement also applies to other federal antitrust violations. (See, e.g., *MetroNet Services Corp. v. Qwest Corp.* (9th Cir. 2004) 383 F.3d 1124, 1130.) California case law holds that the requirement applies to Cartwright Act claims as well. (See, e.g., *Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 548 [78 Cal.Rptr.2d 133].)

■ In addition, the antitrust injury requirement applies to cases alleging conduct that is per se unlawful as well as to cases governed by the rule of reason. In *Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328 [109 L.Ed.2d 333, 110 S.Ct. 1884] (hereafter *Atlantic Richfield*), the United States Supreme Court explained the point as follows: "Actions *per se*

unlawful under the antitrust laws may nonetheless have *some* procompetitive effects, and private parties might suffer losses therefrom. [Citations.] Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason."[8] (495 U.S. at pp. 342–344, fn. omitted.)

The antitrust injury requirement does *not*, however, require an antitrust plaintiff to show actual harm to competition. The United States Supreme Court made the point explicit in *Brunswick*, the very case in which the antitrust injury requirement originated. As the court stated, the antitrust injury requirement does not mean that an antitrust plaintiff "must prove an actual lessening of competition in order to recover." (*Brunswick, supra*, 429 U.S. at p. 489, fn. 14.)

That point was also a central holding of *Klor's v. Broadway-Hale Stores* (1959) 359 U.S. 207 [3 L.Ed.2d 741, 79 S.Ct. 705] (hereafter *Klor's*). In that case, the plaintiff household appliance retailer alleged that a major department store chain had induced 10 appliance manufacturers and their distributors not to sell to the plaintiff, or to sell to it "only at discriminatory prices and highly unfavorable terms." (*Id.* at p. 209.) The defendants submitted evidence that "there were hundreds of other household appliance retailers, some within a few blocks of [the plaintiff] who sold many competing brands of appliances, including those the defendants refused to sell to [the plaintiff]." (*Id.* at pp. 209–210.) On that basis, the defendants argued that the plaintiff could not recover, because nothing they were alleged to have done could have injured competition—the market was competitive and would remain so even if the plaintiff were entirely eliminated from it. The Supreme Court noted that the defense position would mean "that unless opportunities for customers to buy in a competitive market are reduced, a group of powerful businessmen may act in concert to deprive a single merchant, like [the owner of the plaintiff corporation], of the goods he needs to compete effectively." (*Id.* at p. 210.) The court rejected the defense position, holding that conduct that is otherwise forbidden by the antitrust laws "is not to be tolerated merely because the victim is just one merchant whose business is so small that his

---

[8] We note that some lower courts have not used the term "antitrust injury" consistently, sometimes employing it "comprehensively to include injury-in-fact caused by the defendant" or the "impact on competition" of the defendant's alleged conduct. (2A Areeda et al., Antitrust Law, *supra*, ¶ 337a, p. 83; see generally *id.*, pp. 83–84 & fns. 3, 4 [collecting cases].) We, however, "use that term in the precisely focused sense of *Brunswick*. (*Id.* pp. 83–84.)

destruction makes little difference to the economy." (*Id.* at p. 213.) The court further observed that "[m]onopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups. ▮ In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations 'which "tend to create a monopoly," ' whether 'the tendency is a creeping one' or 'one that proceeds at full gallop.' [Citation.]" (*Id.* at pp. 213–214.)

▮ *Klor's* has never been overruled on that point (or any other), and the California Supreme Court has applied the *Klor's* rule to claims under the Cartwright Act. "An anticompetitive practice 'is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.' " (*Marin County, supra,* 16 Cal.3d at p. 935, quoting *Klor's, supra,* 359 U.S. at p. 213.)

▮ In sum, the antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects (as in *Brunswick*). But to make that showing, the plaintiff need not show that the market has actually become less competitive than it would have been without the defendant's conduct—if the market contains numerous participants and is consequently competitive, and the plaintiff is a relatively small player whose injury or elimination would not materially affect market conditions, then the plaintiff is not thereby foreclosed from recovery.[9]

Both in the trial court and on appeal, defendants' antitrust injury argument has relied on the reasoning that was rejected by the United States Supreme Court in *Klor's* and by the California Supreme Court in *Marin County.* According to defendants, Flagship must show that Century's conduct actually rendered the relevant market uncompetitive (or less competitive), which might be evidenced by higher prices or lower supply. Thus, according to defendants, if Century's conduct has not yet "had an anticompetitive effect on consumers," then the market in which the Palme and the River compete must still be at least as competitive as it would have been without Century's conduct, so Flagship cannot show antitrust injury.

---

[9] To prove an antitrust claim subject to the rule of reason, however, a plaintiff must prove that the anticompetitive effects of the defendant's conduct outweigh its procompetitive effects, which might require the plaintiff to prove that the market has actually become less competitive. That is irrelevant to our point here, which is that the antitrust injury requirement, which applies to cases under the rule of reason and the per se rule alike, does not require the plaintiff to show that the market has become less competitive.

The argument fails because, as a matter of law, Flagship may be able to prevail without showing that the market has become less competitive. No other conclusion is possible under *Klor's* and *Marin County*.

Rather, the antitrust injury requirement means that in order to prevail on its antitrust claims, Flagship must show that its "loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." (*Atlantic Richfield, supra*, 495 U.S. at p. 344.) Defendants have not introduced any evidence (or even argued) that Flagship does not have, or cannot reasonably obtain, sufficient evidence to make that showing, so defendants did not carry their initial burden in moving for summary judgment on this issue. (*Aguilar, supra*, 25 Cal.4th at pp. 854–855.)

For all of the foregoing reasons, we conclude that the trial court erred by granting summary judgment in favor of defendants on the basis of the antitrust injury requirement.

### III. Clearances and Market Power

As noted earlier, a clearance is an exclusive right that a film distributor grants to a theater in connection with the licensing of a film, prohibiting the distributor from licensing the film for exhibition at certain other theaters while the film is being shown at the theater that obtained the clearance. (See pt. I., *ante*.) In their motion for summary judgment, defendants stated that the Palme and the River "have had a long history of clearances under prior ownership" and that Century "has requested, and continues to request, clearances for [the River]." Defendants asserted that Flagship's lawsuit "is really complaining about Century's clearance requests," and defendants argued that Century's clearances are lawful under the standards articulated in antitrust case law. The trial court noted the argument but did not rule on its merits, instead granting summary judgment on the basis of defendants' arguments concerning antitrust injury and market definition. Defendants renew the argument concerning clearances in various forms on appeal, contending, for example, that the River's clearances are vertical nonprice restraints with procompetitive effects that render the clearances lawful under the rule of reason.

We have reviewed Flagship's original, first amended, and second amended complaints, as well as its opposition to defendants' summary judgment motion and its briefs on appeal, and we conclude that Flagship has never contended that defendants' clearances are unlawful independent of defendants' alleged circuit dealing. We therefore do not discuss defendants' argument except to note that clearances are vertical nonprice restraints governed by the rule of reason. (*Continental T. V., Inc. v. GTE Sylvania Inc.* (1977)

433 U.S. 36, 57–59 [53 L.Ed.2d 568, 97 S.Ct. 2549] [vertical nonprice restraints are governed by the rule of reason]; *Theee Movies, supra,* 828 F.2d at p. 1398 [clearances are vertical nonprice restraints governed by the rule of reason].)

For the same reasons, we do not discuss defendants' arguments concerning market power and market definition. According to defendants, in order to show that the River's clearances with respect to the Palme are unlawful under the rule of reason, Flagship must show that defendants have market power in the market in which the Palme and the River compete. Defendants' contention that Flagship must show that defendants have market power in the market in which the Palme and the River compete—and that Flagship accordingly must define the boundaries of that market—is thus based on defendants' contention that Flagship's lawsuit is merely a challenge to defendants' clearances. Defendants have not argued that such a showing of market power is required in the context of a circuit dealing case (as opposed to a clearance case), so we do not discuss the issue either.

### IV. Circuit Dealing and Related Discovery

Flagship's original, first amended, and second amended complaints all alleged that Century has engaged in circuit dealing in violation of the Cartwright Act. Defendants' memorandum of points and authorities in support of their motion for summary judgment devoted a single paragraph to the issue, asserting that Flagship "has proffered no evidence of any kind to support" the circuit dealing claim and citing evidence purporting to show that the two dismissed defendant distributors have licensed their films to the River rather than the Palme because they were convinced the River "was the higher grossing theater."

The trial court recognized that defendants' motion "only briefly discuss[ed]" circuit dealing, even though Flagship had "from the initiation of the instant action, both in its papers and before the court, described this as a 'circuit dealing case.' " The court went on to conclude that defendants' antitrust injury argument was fatal to Flagship's circuit dealing claim. That conclusion was erroneous because defendants' antitrust injury argument was legally unsound, as we have already explained. (See pt. II., *ante.*) But the trial court also ruled that Flagship failed to introduce sufficient evidence to create any disputed issues of material fact concerning the circuit dealing claim.

On appeal, Flagship argues that the court's ruling on this issue must be overturned as well because the court abused its discretion by making discovery rulings that impermissibly curtailed Flagship's efforts to gather evidence of circuit dealing. We agree.

"Appellate courts must keep liberal policies of discovery statutes in mind when reviewing decisions denying or granting discovery. [Citation.] Absent a showing that substantial interests will be impaired by allowing discovery, liberal policies of discovery rules will generally counsel against overturning a trial court's decision *granting* discovery [citation] and militate in favor of overturning a decision to *deny* discovery. [Citation.]" (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 987 [118 Cal.Rptr.2d 715].) Discovery rulings are reviewed for abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736].)

The trial court granted defendants' requests to limit discovery to the geographic area of the Coachella Valley, which defendants claim is the geographic market in which the Palme and the River compete. Because of the nature of Flagship's circuit dealing claim, those rulings constituted error.

Flagship's circuit dealing claim alleges that (1) Century's theater circuit outside of the market in which the Palme and the River compete is of such a size and nature as to give Century considerable power, and (2) Century has used that power to Flagship's detriment in the market in which the Palme and the River compete. Thus, in order to gather evidence to support its circuit dealing claim, Flagship must be permitted to engage in discovery concerning Century's theater circuit and film licensing practices outside the market in which the Palme and the River compete. The essence of Flagship's claim is that Century has used its power outside the Palme/River market to influence competition within the Palme/River market. Flagship cannot gather evidence in support of that claim if it is limited to collecting evidence within the Palme/River market. The trial court's imposition of such a geographical limitation on Flagship's discovery was consequently erroneous.

In so holding, we do not tie the trial court's hands with respect to the management of discovery in this action. On remand, if the parties seek to limit or structure discovery in a particular manner—such as by conducting it in phases or stages—the court may grant any such requests as are reasonable. We hold only that the court's limitation of discovery to the Coachella Valley was too narrow.

On appeal, defendants' arguments in support of the trial court's discovery rulings are based on defendants' claim that Flagship could not prevail on any

of its claims without first showing that "Century possessed sufficient market power in a properly defined geographic market [(namely, the market in which the Palme and the River compete)] to have caused actual anticompetitive effect—injury to consumers—in that market." Thus, according to defendants, the limitations on discovery were proper because the trial court was merely streamlining discovery "to allow for potentially case dispositive issues to be litigated at an early stage." Defendants' arguments fail for the reasons explained in parts II. and III., *ante.*

Because we conclude that the trial court's ruling on the circuit dealing claim must be reversed on the basis of the court's erroneous discovery rulings, we need not decide whether defendants carried their initial burden of either conclusively negating an element of the claim or showing that Flagship lacked and could not obtain evidence of prohibited circuit dealing.[10] But because it will be relevant to the proceedings on remand, we wish to clarify one point of law raised by defendants' arguments. On appeal, defendants contend that circuit deals are agreements " 'whereby exhibitors use their monopoly power (or near monopoly power) in one or more areas to negotiate blanket exclusive agreements with distributors covering *all of their* theaters, including areas where they may have competition.' " (Quoting *Reading Internat. v. Oaktree Capital Management LLC* (S.D.N.Y. 2003) 317 F.Supp.2d 301, 318, fn. 9, italics added by defendants.) On that basis, defendants argue that without evidence of at least one blanket licensing agreement that includes *all* of Century's theaters, Flagship cannot prove prohibited circuit dealing.

 We disagree. The United States Supreme Court cases describe circuit dealing as, for example, a theater circuit's use of monopoly power in certain locations "to acquire exclusive privileges in a city where [the circuit] has competitors." (*Griffith, supra,* 334 U.S. at p. 107.) The court also condemned as unlawful circuit dealing certain "master agreements that cover exhibition in two or more theatres in a particular circuit" or "covering the exhibition of features in a number of theatres." (*Paramount Pictures, supra,* 334 U.S. at p. 154.) The sole California case concerning circuit dealing describes it in similar terms and on the basis of the same authorities. (*Redwood Theatres, supra,* 200 Cal.App.3d at p. 695 [a prohibited master agreement "covered exhibition in several theatres in a particular circuit"].) Nothing in the discussion in any of those cases suggests that prohibited circuit dealing is

---

[10] The trial court's ruling on defendants' summary judgment motion does not state that defendants carried their initial burden on those points. Rather, after rejecting the circuit dealing claim on the ground that Flagship failed to show antitrust injury, the court stated that Flagship had presented "no evidence whatsoever to raise a triable issue of fact supportive of a true circuit dealing issue in this case." But the court did not first assess whether defendants had carried their initial burden on that issue.

limited to agreements that cover *all* of the theaters in a circuit. Rather, they suggest that it is not so limited.

The case law explains that circuit dealing is prohibited because it enables a powerful circuit to gain "advantages for itself and impose[] restrictions on its competitors which otherwise would not have been possible." (*Schine Theatres v. United States* (1948) 334 U.S. 110, 114 [92 L.Ed. 1245, 68 S.Ct. 947].) It is both an abuse of monopoly power and a means for " 'stifling competition' " by " 'diverting the cream of the business to the large operators.' " (*Redwood Theatres, supra,* 200 Cal.App.3d at pp. 695–696, quoting *Paramount Pictures, supra,* 334 U.S. at p. 154.) Given those reasons for the prohibition against circuit dealing, defendants' proposed rule—which would make a blanket licensing agreement lawful as long as it omitted at least one of the circuit's theaters—makes no sense. When a dominant theater circuit uses its overall size or its monopoly power in certain locations (or both) to obtain more favorable film licensing treatment in competitive locations than it otherwise could have obtained, the circuit's conduct may have the same effects regardless of whether the resulting licensing agreements cover all of the theaters in the circuit or only some of them. For example, a licensing agreement for a "commercial" film might exclude all of the "art house" theaters in the circuit, but the agreement might still be anticompetitive and a prohibited circuit deal.

For the foregoing reasons, we conclude that the summary judgment as to Flagship's circuit dealing claim must be reversed because the trial court abused its discretion by limiting discovery to the Coachella Valley. We also reject defendants' contention that unlawful circuit dealing is limited to licensing agreements that cover all of the theaters in a circuit.

## V. The Rule of Reason, the Per Se Rule, and Circuit Dealing

Flagship contends that circuit dealing is per se unlawful under the Sherman Act, cites cases such as *Paramount Pictures, supra,* 334 U.S. 131, and *Griffith, supra,* 334 U.S. 100, and urges us to hold that circuit dealing is per se unlawful under the Cartwright Act as well. Defendants contend that "[u]nder California law, circuit dealing agreements are vertical, non-price restraints evaluated under the rule of reason," citing *Redwood Theatres, supra,* 200 Cal.App.3d 687.

As our analysis in the foregoing parts of this opinion demonstrates, in order to decide this appeal we need not determine whether circuit dealing is subject to the per se rule or the rule of reason under the Cartwright Act. Regardless of which rule applies, the trial court erred when it granted defendants' motion for summary judgment.

It might nonetheless seem advisable for us to decide the issue so as to provide guidance to the trial court for the proceedings on remand. We conclude, however, that we cannot decide it, because it implicates too many unbriefed legal issues and too many factual and legal indeterminacies.

For example, as defendants themselves acknowledged in the trial court, Flagship appears to allege that Century has engaged in prohibited circuit dealing in the form of monopoly leveraging. (See generally pt. I., *ante* [describing this form of prohibited circuit dealing].) But, as defendants also mentioned, the Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2), and the Cartwright Act applies only to a "combination" involving "two or more persons" (§ 16720), not to *unilateral* conduct. (See *Bondi v. Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672, 677–678 [73 Cal.Rptr. 494].) One question, then, is whether Century's agreements with distributors are sufficient to show a "combination" within the meaning of the Cartwright Act for purposes of a circuit-dealing-as-monopoly-leveraging claim. If so, then a separate question is whether such a claim is cognizable under the Cartwright Act. The parties have briefed none of these issues.

Putting aside the monopoly leveraging theory, other questions about Flagship's circuit dealing claim remain. *Paramount Pictures* held that licensing agreements covering two or more theaters in a circuit were unlawful under the Sherman Act because "they eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." (*Paramount Pictures, supra,* 334 U.S. at p. 154.) What are the elements of such a claim? Apart from defendants' erroneous contention that prohibited circuit deals are limited to licensing agreements that cover *all* of the theaters in a circuit, the parties have not briefed this issue either.

The type of circuit dealing claim at issue might influence the analysis of whether the per se rule or the rule of reason should apply, because it might make certain authorities or analogies more relevant than others. *Redwood Theatres,* for example, says nothing about whether circuit dealing as monopoly leveraging is subject to the per se rule rather than the rule of reason,

because "the issue of abuse of monopoly power" was not presented in that case. (*Redwood Theatres, supra*, 200 Cal.App.3d at p. 696.) And depending on the precise contours of Flagship's circuit dealing claim, group boycotts might (or might not) present a close analogy. (See *id.* at pp. 699–703 [discussing the analogy between circuit dealing and boycotts]; see also *Nynex Corp. v. Discon, Inc.* (1998) 525 U.S. 128, 135 [142 L.Ed.2d 510, 119 S.Ct. 493] [holding that the *Klor's* rule of per se illegality for boycotts applies only "to cases involving horizontal agreements among direct competitors"].)

In the absence of greater factual and legal development of Flagship's claims and the parties' arguments, we cannot say definitively whether Flagship's circuit dealing claim should be analyzed under the per se rule or the rule of reason. We accordingly do not decide the issue.

## VI. The Sealed Briefs and the Sealed Portions of the Record

Early in this litigation, the trial court entered a stipulated protective order that authorized the parties to designate as "confidential" or "confidential: attorney's eyes only" any "document, thing, material, testimony or other information derived therefrom." (The distinction between "confidential" and "confidential: attorney's eyes only" is of no significance for our discussion, so we will henceforth use "confidential" to cover both.) The "confidential" designation meant that the information so designated "has not been made public and . . . concerns or relates to the confidential business, commercial, financial, or other similarly sensitive information concerning the parties' business operations and the subject matter of the present litigation." Any party making such a designation was thereby "certifying to the Court that there is a good faith basis in law and in fact for the designation, and that there exists an overriding interest in confidentiality that overcomes any right of public access to the record." The stipulated protective order further provided that if any confidential material was included in any papers to be filed with the court "for purposes of adjudication," the parties would follow the procedures of the California Rules of Court, rules 2.550 and 2.551, concerning sealed records.

The parties went on to designate various materials as confidential. The parties then used some of the confidential materials in connection with certain discovery motions and defendants' motion for summary judgment. In some instances the parties filed applications to file the relevant papers under seal, while in others the parties lodged the papers conditionally under seal and

moved for an order sealing them. The trial court ultimately entered an order sealing all of the records at issue.

On appeal, the parties moved in this court for an order sealing the portions of the clerk's transcript that contained documents sealed by the trial court, and also for orders sealing the unredacted versions of the parties' appellate briefs. We granted the motions.

As a result, the parties filed both redacted and unredacted versions of their appellate briefs, with the unredacted versions filed under seal. The superior court clerk likewise prepared both a 12-volume redacted clerk's transcript, a five-volume redacted supplemental clerk's transcript containing documents inadvertently omitted from the original 12-volume redacted clerk's transcript, and a four-volume unredacted supplemental clerk's transcript, filed under seal, containing the documents that had been both designated for inclusion in the record on appeal and sealed by the trial court. The redactions in the parties' briefs and the clerk's transcripts are substantial.

Upon reviewing the merits of the appeal, we concluded that there appeared to be no basis for sealing most, if not all, of the redacted text in the parties' briefs. Pursuant to rule 2.551(h)(3) of the California Rules of Court, we notified the parties that we proposed to unseal the unredacted versions of their briefs, as well as a passage in the unredacted supplemental clerk's transcript that we had identified as potentially necessary to our analysis. In our notice, we stated that any party wishing to oppose the unsealing of the records at issue should file opposition by a date we specified.

No party filed any opposition. That is, no party undertook to defend the sealing of even a single line of the pages of text that were redacted in the publicly accessible versions of their briefs.

By separate order, we are unsealing the unredacted versions of the parties' briefs. Because of the possibility that some portion of the records sealed by the trial court actually ought to remain sealed, we are not vacating the trial court's sealing orders. We do, however, direct the trial court to revisit the issue on remand. Pursuant to rule 2.551(h)(3) of the California Rules of Court, the trial court shall inform the parties that it proposes to unseal all of the records it previously sealed and that any party wishing to oppose the unsealing must file written opposition by a deadline to be specified by the trial court (subject, of course, to any requests for extensions of time, which the trial court may grant or deny in its discretion), and that parties may also file replies to the oppositions, also by deadlines specified by the trial court.

## DISPOSITION

The judgment is reversed, the superior court is directed to enter a new and different order denying Century and Cinemark's motion for summary judgment, and the case is remanded for further proceedings consistent with this opinion. Appellant shall recover its costs of appeal.

Mallano, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied September 29, 2011, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 30, 2011, S197136.