Filed 10/2/20 (on rehearing)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FLAGSHIP THEATRES OF PALM DESERT, LLC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CENTURY THEATRES, INC., et al.,<br><br>Defendants and Appellants. | B292609<br><br>(Los Angeles County Super. Ct. No. SC090481) |
| FLAGSHIP THEATRES OF PALM DESERT, LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CENTURY THEATRES, INC., et al.,<br><br>Defendants and Respondents. | B299014<br><br>(Los Angeles County Super. Ct. No. SC090481) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Lisa Hart Cole, Judge.  Reversed (B292609).  Dismissed (B299014).

Norton Rose Fulbright, Peter H. Mason, Joshua D. Lichtman Lesley Holmes, Michael A. Swartzendruber and Barton W. Cox for Defendants and Appellants (B292609) and Defendants and Respondents (B299014).

Perkins Coie, Thomas L. Boeder, Elvira Castillo, Donald J. Kula, Sunita Bali and Alisha C. Burgin for Plaintiff and Appellant (B299014) and Perkins Coie, Thomas L. Boeder, Elvira Castillo and Donald J. Kula for Plaintiff and Respondent (B292609).

———————————————

This appeal arises from an antitrust dispute involving the licensing of motion pictures to movie theaters for public exhibition. Plaintiff Flagship Theatres of Palm Desert, LLC (Flagship), which previously owned the movie theater Palme d'Or in the Coachella Valley, obtained a jury verdict against defendants Century Theatres, Inc. and Cinemark USA, Inc. (collectively, Century),[1] which owned The River, a theater located two miles away from Palme d'Or. Century owns a circuit of theaters throughout the country as well. The jury found true Flagship's allegations that Century had engaged in a practice known as "circuit dealing" by entering into licensing agreements with film distributors that covered licenses to play films not just at The River, but at multiple other Century-owned theaters as well, and using these agreements to pressure distributors into refusing to license films to Palme d'Or.

---

[1] Cinemark acquired Century in October 2006. We use the term "Century" to refer to both parties. When referring individually to either, we use the terms "Cinemark USA" and "Century Theatres," respectively.

In reaching this verdict, the jury made several more specific findings regarding the competitive effects of the agreements, including that the agreements harmed competition in the relevant market. On appeal (case No. 292609), Century argues substantial evidence does not support these findings, that there can be no antitrust liability without such evidence, and that the judgment in Flagship's favor should therefore be reversed. In the alternative, Century argues that the court committed reversible error by admitting into evidence certain testimony and emails Century argues are inadmissible prejudicial hearsay, and that the jury's verdict is an impermissible "compromise verdict."

We agree with Century that Flagship did not present substantial evidence of anticompetitive effects in the relevant market. We further agree with Century that this failure of proof warrants reversal, as circuit dealing based on multi-theater licensing agreements is not per se illegal under the Cartwright Act. We therefore reverse the judgment and need not reach Century's remaining arguments on appeal. Nor need we address Flagship's appeal (case No. B299014)[2] from the court's postjudgment order awarding Flagship attorney fees in an amount lower than Flagship had requested.

---

[2] This court granted the parties' joint motion to consolidate oral argument in Century's appeal (case No. B292609) and Flagship's appeal (case No. B299014) in October 2019. On its own motion, the court hereby consolidates the two appeals for all purposes.

# FACTUAL AND PROCEDURAL BACKGROUND

## A.    *Film Industry Background*

In the motion picture industry, film studios, also known as distributors, own the copyrights to films, and grant licenses to theaters, also known as exhibitors, to play those films to the general public.

A group of film distributors, referred to as the "major" and "mini-major"[3] film studios, collectively distribute the majority of "first-run commercial films in the United States."  First-run films are "new films that exhibitors play immediately following the release date."  A "commercial film" is one that has high "grossing ability" because it will appeal to a large audience.  "[O]n the other end of the spectrum" from "commercial films" are the "more artistic class movies," "class title[s] that might come out on a more limited release basis."

Distributors usually license first-run films on a "day and date" basis, meaning they grant licenses to a theater regardless of whether nearby theaters are also licensing the film at the same time.  When two or more theaters are located very close to each other, however, distributors license a film to only one of those theaters for a period immediately following a film's initial release. This is referred to as a "clearance" situation, or a "competitive zone."  A clearance is "an exclusive right that a film distributor grants to a theater in connection with the licensing of a film" that

---

[3] Specifically, seven distributors known as the "majors"— Universal, Fox, Paramount, Sony, Disney, Warner Bros., and Lionsgate— together with a few "mini-majors," "account for 95 percent of the industry."

"prohibits the distributor from licensing the film for exhibition at certain other theaters . . . while the film is being shown at the theater that obtained the clearance." (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1375 (*Flagship I*).)

After the initial period of time covered by a clearance, a distributor may choose to license the film to the other theater or theaters in the clearance zone. At that point, however, the film is no longer a first-run film, but a less lucrative "moveover."

Although a clearance by definition means only one theater in the zone may exhibit a given film during the clearance period, distributors do not necessarily grant clearances to all their films to the same theater. Instead, a distributor may choose to allocate films between theaters in the zone, granting one theater clearances to some films, and the other theater (or theaters) in the zone clearances to other films.

During the relevant time period for this case (2003–2016), clearances were common throughout the country.[4] A particular clearance may violate antitrust laws if it is shown to cause actual harm to competition that outweighs any procompetitive benefits of the clearance. (*Orson, Inc. v. Miramax Film Corp.* (3d Cir. 1996) 79 F.3d 1358, 1372 (*Orson*).) But clearances have withstood antitrust scrutiny on several occasions because they can and often do generate a net benefit to consumers by increasing the selection of films that theaters offer and stimulating competition on bases other than film selection. (See, e.g., *ibid.*; *Three Movies of Tarzana v. Pacific Theatres, Inc.* (9th Cir. 1987) 828 F.2d 1395, 1399

---

[4] In 2016, distributors shifted away from granting clearances in competitive zones. Paramount is a notable exception, having stopped honoring clearances in 2009.

(*Tarzana*); *Soffer v. Nat'l Amusements Inc.* (D.Conn. Jan. 10, 1996, No. CIV 3:91CV472(AVC)) 1996 WL 194947 *6 (*Soffer*) [clearances "increased the overall choice of films to customers" in that market].)

### B.  *The River and Palme d'Or Theaters*

Century Theaters was an exhibitor that owned 80 theaters, including a theater called The River in Rancho Mirage, California. In 2006, another exhibitor, Cinemark USA, acquired Century Theatres.  Following this acquisition, the combined entity (Century) operated approximately 300 theaters throughout the country, including The River.

Flagship owned and operated a single theater in Palm Desert, Palme d'Or (the Palme), from 2003 until mid-2016.  Flagship's investors (and thus, the Palme's owners) include the actor, Bryan Cranston.

Both The River and the Palme were located in the Coachella Valley, a collection of towns largely populated by an older, more affluent demographic.  State Route 111 (Route 111) is the valley's main thoroughfare, facilitating travel between these towns, which include Palm Springs, Cathedral City, Palm Desert, Rancho Mirage, Indian Wells, and La Quinta.  The River and the Palme are approximately two miles apart from each other on Route 111.

The Coachella Valley has "a lot of theatres," most of which are located on or minutes off of Route 111.  Multiple theaters are located "not all that far from" The River and the Palme in terms of both drive time and distance.  At trial, Flagship witnesses testified that the Palme competed for patrons with these theaters, including The River, the Mary Pickford 14 in Cathedral City, the Regal Rancho 16 in Rancho Mirage, the Regal in Palm Springs, the Regal Metro 8 in Indio, and the La Quinta in La Quinta.

6

Although the specific driving distances between the Westfield Mall in Palm Desert (where the Palme was located) and these other theaters are not included in the record on appeal, on the court's own motion, we take judicial notice of these distances as being approximately 2 miles, 6 miles, 6 miles, 12.5 miles, 10 miles, and 6.5 miles, respectively.[5]

Differences in what The River and the Palme offered their patrons are central to the parties' arguments on appeal. The River has 15 screens and is located in an outdoor shopping area. The River is a typical commercial movie theater with stadium seating and a typical movie theater concession area. It caters to adult, teen, and family audiences.

The Palme had 10 screens and was located in an indoor mall. The Palme is an "art house theater" with a stated mission of offering a wide selection of independent, foreign, and other artistic class films that otherwise would not be seen in the Coachella Valley. Accordingly, the films the Palme exhibited

---

[5] Evidence Code section 452, subdivision (h) permits judicial notice of "[f]acts . . . that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) Such facts include locations and distances between locations. (See *People v. Traugott* (2010) 184 Cal.App.4th 492, 497, fn. 4 [taking judicial notice of distance between locations under Evid. Code, § 452, subd. (h)]; *In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1153 [same]; see also *People v. Posey* (2004) 32 Cal.4th 193, 215, fn. 9 [taking judicial notice of the location of a city under Evid. Code, § 452, subd. (h)].)

excluded "very commercial titles,"**6** although the Palme did seek to show some "high-end adult commercial" pictures.**7** This mix of offerings was designed to appeal to "sophisticated, discerning film fans" seeking "upscale, adult programming." The theater "[did] not have a youth audience, at all," and instead "focus[ed]" on "a cultured adult audience and seniors."

When the Palme opened, it made its desired mix of films known to distributors. It explained to distributor Sony, for example, that the Palme "will not be asking for, nor expecting, most Sony product, as this is not a typical mainstream venue. Please continue to sell . . . [T]he River all the very commercial titles." Universal similarly understood that the Palme "[was] only interested in certain films. They didn't really care about a lot of them."

The Palme's decor and amenities were designed to create an upscale art house theater experience as well. Flagship redecorated the building's interior, creating an "elegant" lobby of granite, slate, and hand-painted decorations. It had a café that offered "gourmet" food and "bistro fare" such as espresso drinks, smoothies and "premium desserts." The theater also had sloped floors to accommodate patrons with canes and walkers.

---

**6** Examples of "very commercial" films include the franchises *Star Wars*, *X-Men*, and *Mission: Impossible*, as well as Pixar films.

**7** The Palme's business plan therefore called for "a collection of main titles" that were "supplement[ed] in the other screens . . . with titles that people weren't very familiar with," including independent and foreign films. "[D]uring the trailers" for first-run commercial movies, the Palme "would show all the other films [it was] screening at the theatre."

8

The Palme pledged to offer "the best selection of art, independent, foreign, documentary, experimental, and classic films" along with the "best service, the best ambiance, the best café menu, the best technical presentation, and the very best overall movie-going experience in the desert."

The Palme also hosted "special events" at which artists from around the country— including Oscar-winning actors and directors—would participate in question and answer sessions following the screening of a film. These events sold out and allowed patrons to talk directly to well-known actors, directors and writers, whom co-owner Cranston knew from his work in the film industry. These events, however, began at the Palme before Cranston became an investor in the theater.

## C. *The Palme and Its Predecessor's Difficulty Obtaining Licenses to First-Run Films*

The space Flagship operated as the Palme had been in a clearance situation with The River for years before the Palme opened, and Flagship was aware of this before it chose the space. The Palme's predecessor, The Town theater, obtained some first-run film licenses from the major distributors. There is conflicting evidence in the record as to how evenly the distributors allocated clearances between The River and The Town.

When the Palme opened in 2003, it was not "awarded a high end commercial film for an entire year." The River routinely requested and received clearances over the Palme for such films.

The Palme continued to have difficulties licensing first-run films from the major distributors in the years that followed. In some years during the relevant period, one or more major distributors did not license a single film to the Palme. For example, between 2002 and 2005, Paramount did not license any films to the

Palme, and in 2003, 2006, and 2014, Universal did not license any films to the Palme. On several occasions, the Palme offered to license a distributor's first-run film on terms particularly attractive to the distributor—for example, by offering more screens, longer runs and a larger film rental payment than did The River, as well as a guaranteed minimum film rental—but these offers were unsuccessful. Uncontradicted expert testimony based on "Rentrak" data reflects, however, that in terms of first-run films *overall*— that is, not just the high grossing films or films from major distributors—"the Palme actually had . . . slightly more first[-]run films [from November 2003 to June 2016] than [T]he River." "[O]f those 1414 first[-]run films [shown at the Palme], more than half"— 55 percent—"were shown no place else in the entire Coachella Valley."

### D. *Flagship Attributes Its Difficulty Obtaining Licenses to Century's "Circuit Dealing" and Sues Century*

Flagship sued Century in 2007, alleging that the manner in which Century licensed films caused distributors to deny the Palme licenses to the most lucrative first-run commercial films, and that these film license agreements violated the Cartwright Act, California's antitrust law. (See Bus. & Prof. Code, § 16720 et seq.) Specifically, Flagship alleged that Century's film licensing agreements, including agreements with the major and mini-major film studios, reflected a practice referred to as "circuit dealing"— " 'the pooling of the purchasing power of an entire [theater] circuit in bidding for films,' which undermines the competitive process of bidding for film licenses 'theatre by theatre.' " (*Flagship I, supra,* 198 Cal.App.4th at p. 1375, quoting *United States v. Paramount Pictures* (1948) 334 U.S. 131, 154 (*Paramount Pictures*).) The

United States Supreme Court has recognized two distinct forms of circuit dealing. The first "is a form of monopoly leveraging, that is, 'a monopolist's use of power in one market to gain an advantage in a related market.' (Sullivan & Grimes, The Law of Antitrust: An Integrated Handbook (2000) § 3.4b1, p. 106.) For example, one of the United States Supreme Court cases concerning circuit dealing addressed certain 'master agreements' between distributors and movie theater circuits that 'lumped together towns in which the [circuits] had no competition and towns in which there were competing theaters.' (*United States v. Griffith* (1948) 334 U.S. 100, 102–103 . . . .)" (*Flagship I, supra*, 198 Cal.App.4th at p. 1375.) The other type of circuit dealing occurs where a theater circuit owner does not necessarily have or leverage monopoly power in any region, but its "agreements cover[ ] multiple theaters within a particular circuit" and " 'eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first[-]runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators.' " (*Id.* at p. 1376, quoting *Paramount Pictures, supra,* 334 U.S. at p. 154.)

For ease of reference, we refer to these two types of circuit-dealing claims as "monopoly circuit-dealing claims" and "non-monopoly circuit-dealing claims," respectively.

Flagship alleged Century engaged in both types of circuit dealing. Namely, it alleged that (1) Century leveraged its power as the owner of numerous theaters across the country—some in areas with little or no competition—to pressure distributors into granting The River clearances over the Palme, and (2) Century's practice of negotiating multi-theater licensing agreements exerted pressure on

11

distributors to shun the Palme or risk losing business from Century outside the Coachella Valley. The complaint also alleged that Century exerted further pressure on distributors to grant The River clearances over the Palme by licensing multiple films from a distributor at once—that is, Century would agree to play an entire slate of a distributor's current films, even the less desirable ones.[8]

Flagship's lawsuit did *not* allege that the clearances between the two theaters violated the antitrust laws—that is, that the clearances were themselves agreements prohibited by the Cartwright Act. Rather, Flagship alleged The River's clearances over the Palme were the fruits of Century's challenged circuit-dealing agreements, and thus a product of—but not themselves—an antitrust violation. (*Flagship I, supra*, 198 Cal.App.4th at pp. 1381–1382.)

### E. *The Palme Closes and the Tristone Palme 10 Opens in Its Place*

In 2016, the mall where the Palme was located elected not to renew Flagship's lease. Specifically, while Flagship was negotiating for a permanent lease of the space, the mall informed Flagship that it wanted to lease to a different theater operator, and indicated to Flagship that the other exhibitor was willing to pay more. Flagship witnesses testified that Flagship had a limited ability to bid for the lease due to a lack of "fair access to product" resulting from Century's challenged circuit dealing.

---

[8] Flagship does not argue that such multi-*film* licensing agreements (as opposed to multi-theater agreements) constitute a form of circuit dealing, nor would such an argument find support in the current law.

12

The Palme closed on June 30, 2016, and the Tristone Palme 10 (the Tristone) opened a "[m]atter of days" thereafter in the same space. The theater was not renovated prior to the Tristone opening, and the new management continued to play independent and unique films. Specifically, expert testimony reflects that 37 percent of the films shown at the Tristone in its first 15 months of business (from July 2016 to September 2017) were not offered elsewhere in the Coachella Valley. Nothing in the record suggests that the Tristone has since closed.

## F. *The Jury Verdict*[9]

At trial, Flagship pursued both its monopoly circuit-dealing claim, based on Century's alleged leveraging of monopoly power in markets outside the Coachella Valley, and its non-monopoly circuit-dealing claim, based on Century's licensing agreements that covered multiple theaters. In its closing argument, Flagship reiterated to the jury that it was not challenging the clearances as such: "[Flagship did] not contend that clearances in the absence of circuit dealing are unlawful. They're not. Clearances always existed in this zone. Clearances don't play a role in this case."

The parties disputed which antitrust analytical framework applied to Flagship's circuit-dealing claims—specifically, whether

---

[9] This case came before this court on two occasions before proceeding to trial. First, in 2011, we reversed the trial court's initial summary judgment ruling in Century's favor based on the sufficiency of the evidence to establish antitrust injury. We further held that "the court [had] abused its discretion by making discovery rulings that impermissibly curtailed Flagship's efforts to gather evidence of circuit dealing" outside the Coachella Valley, and reversed the summary judgment ruling on this basis as well. (*Flagship I, supra,* 198 Cal.App.4th at p. 1383.) After further

either or both claims were subject to the antitrust "rule of reason," as opposed to a per se rule. As we discuss in more detail below, if a per se framework applies, an antitrust plaintiff need only prove the act of circuit dealing and is not required to show that the conduct resulted in harm to competition. (See *In re Cipro Cases I & II* (2015) 61 Cal.4th 116, 146.) Under the rule of reason, by contrast, the plaintiff must prove that the defendant's conduct harmed competition in the relevant market and that any procompetitive justifications for the conduct did not outweigh that harm. (See, e.g., *ibid.*; *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680–1681 (*Exxon*).)

The court ultimately concluded that monopoly circuit dealing is per se illegal under the Cartwright Act, such that Flagship did not need to prove actual harm to competition in order to prevail. As to Flagship's non-monopoly circuit-dealing claim, however, the trial court concluded that the rule of reason applied. Thus, the court instructed the jury that, in order for Flagship to prove its non-monopoly circuit-dealing claim, Flagship had to prove both the elements of that claim[10] *and* that the multi-theater licensing

discovery, the case was dismissed in 2014 on the eve of trial based on a spoliation issue. In 2016, we reversed that ruling (*see Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (May 24, 2016, B257148) [nonpub. opn.]), and the case ultimately proceeded to trial in 2018.

[10] The court identified as the elements of a non-monopoly circuit-dealing claim that: (1) Century "was a dominant theatre circuit"; (2) Century "pooled its purchasing power to enter into licensing agreements for specific films that included multiple theatres, including, at least, [T]he River and one or more other theatres"; (3) "by entering into such multiple theatre licensing agreements, the film distributors were precluded from determining

14

agreements underlying the claim caused an "anticompetitive effect" that "outweighed any beneficial effect on competition."[11]

The jury ultimately found that Century had *not* "engage[d] in the monopoly leveraging form of circuit dealing in violation of the California antitrust laws,"[12] but that Flagship *had* proven its non-monopoly circuit-dealing claim. In reaching this verdict, the jury made several more specific findings, corresponding to the components of a rule of reason analysis. Namely, the jury found that Century's multi-theater agreements "cause[d] harm to competition in the relevant geographic and product market[ ]

on a theatre-by-theatre basis which theatres would be licensed for a particular film, thereby eliminating the opportunity for the small competitor to obtain the choice first[-]runs"; (4) "[p]laintiff was in fact precluded from competing for first[-]run films as a result of [Century] entering into multiple theatre licensing agreements"; and (5) plaintiff suffered damages as a result.

[11] Although the latter additional instruction did not specifically state that the harm must occur in a defined relevant market, the special verdict form required a finding to this effect.

[12] The jury was instructed that the elements of such a claim were that: (1) Century "possessed sufficient market power outside the market where the Palme and [T]he River competed"; (2) Century "used its market power by communicating to a film distributor that [Century] will not exhibit the distributor's films in [Century] theatres outside the market where the Palme and [T]he River competed in order to coerce the distributor to allocate films exclusively to [T]he River rather than the Palme"; (3) this "use of its market power caused a film distributor to agree to license first[-]run films exclusively to [T]he River, rather than to the Palme, in a manner contrary to the film distributor's own best interest and that prevents the licensing of films theatre by theatre"; and (4) plaintiff suffered damages as a result.

15

in the form of . . . decreased output of film,"[13] and that "the anticompetitive effects of [defendants'] conduct in entering into licensing agreements covering multiple theaters outweigh[ed] the procompetitive benefits of such conduct in the relevant geographic and product markets."  The jury was not asked to make an express finding regarding the definition of the relevant market in which these anticompetitive effects occurred, but the court instructed the jury as to the parties' competing proposed definitions of the relevant market in this case.  With respect to the geographic scope of the relevant market, the court had instructed that, "[i]n connection with your evaluation of [Flagship's] claim that [Century] entered into film licensing agreements covering multiple theatres, [Flagship] claims that one relevant geographic market for antitrust purposes contains only the Palme and [T]he River.  [Century] claims that one relevant geographic market for antitrust purposes is broader than [T]he River and the Palme, and includes other theaters in the greater Coachella Valley."

The jury awarded Flagship $1.25 million in damages, which was automatically trebled to $3.75 million, pursuant to provisions of the Cartwright Act applicable to all successful private antitrust suits.  (See Bus. & Prof. Code, § 16750, subd. (a) ["Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor

---

[13] The jury verdict form references harm to competition in the form of either increased prices or reduced output, and does not require the jury to indicate which it found to be true.  All parties acknowledge, however, that Flagship has never argued a price effect, and that no evidence regarding pricing was presented at trial.  We therefore focus solely on the output restriction language in the jury's finding.

in any court having jurisdiction . . . [and] recover three times the damages sustained by him or her."].)

### G.    *Posttrial Motions and Appeals*

Century moved for judgment notwithstanding the verdict or, in the alternative, a new trial based on several arguments, including those raised in the instant appeal.  The court denied the motion, noting that as a result of Century's multi-theater licensing practices, "the Palme was unable to show first[-]run films[,] and consumers were denied a choice of theaters," which the court deemed to be an anticompetitive effect in the relevant market. Finally, the trial court rejected Century's new trial arguments regarding statements Century challenged as hearsay and the jury having reached an improper "compromise verdict."  Century timely appealed the judgment following the jury's verdict and the court's order denying Century's motion for judgment notwithstanding the verdict and for a new trial.

As required by the Cartwright Act, the trial court awarded Flagship attorney fees, although not in the amount Flagship had requested.  (Bus. & Prof. Code, § 16750, subd. (a) ["Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor . . . shall be awarded a reasonable attorneys' fee together with the costs of the suit."].)  Flagship timely appealed the court's postjudgment order regarding attorney fees.

17

## DISCUSSION

On appeal, Century argues that: (1) substantial evidence does not support the relevant geographic market definition Flagship identified at trial; (2) substantial evidence does not support the jury's finding that Century's multi-theater licensing agreements harmed competition in that or any other market; (3) the court committed reversible error by permitting into evidence certain testimony and emails Century argues constitute prejudicial, inadmissible hearsay; and (4) the jury's verdict is an impermissible "compromise verdict."

We need only address Century's arguments regarding the sufficiency of the evidence, as these are dispositive of both appeals.

## I. APPROPRIATE ANTITRUST ANALYTICAL FRAMEWORK

Flagship first responds to Century's arguments regarding the sufficiency of the evidence by contending that Century's multi-theater licensing agreements are per se illegal under the Cartwright Act, rather than subject to the rule of reason, and thus that Flagship was not *required* to prove anticompetitive harm in a properly defined market in order to prevail.[14] Thus, we must first decide whether the rule of reason is in fact the appropriate analytical framework for Flagship's non-monopoly circuit-dealing claim. (See *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837 ["[w]e answer . . . questions [of law] through de novo review"].) As discussed below, we conclude that it is.

_____

[14] Flagship also argues that, even if the rule of reason applies, substantial evidence supports the jury's findings under the rule of reason as well. We address these arguments in the Discussion *post*, part II.

## A.     *The Rule of Reason and Per Se Illegality Generally*

The distinction between per se and rule of reason analysis stems from the fact that the Cartwright Act, like its federal counterpart the Sherman Act, prohibits not *all* agreements restraining trade, but rather agreements that *unreasonably* restrain trade.  (See *Business Electronics v. Sharp Electronics* (1988) 485 U.S. 717, 723 (*Business Electronics*) [Sherman Act]; *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 930–931 (*Palsson*) ["In general, only unreasonable restraints of trade are prohibited [by the Cartwright Act]."].)

The Cartwright Act states that "[e]xcept as provided in this chapter, every trust is unlawful, against public policy and void."  (Bus. & Prof. Code, § 16726.)  Section 16720 defines the term "trust" as "a combination of capital, skill or acts by two or more persons" for certain enumerated anticompetitive purposes, including "[t]o create or carry out restrictions in trade or commerce."  (*Id*., § 16720, subd. (a).)  That prohibition is analogous to the catchall language of section 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce."  (15 U.S.C. § 1; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 838.)

"The term 'restraint of trade' . . . refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances."  (*Business Electronics, supra*, 485 U.S. at p. 731.)  Nevertheless, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise

19

harm they have caused or the business excuse for their use."
(*Northern Pac. R. Co. v. United States* (1958) 356 U.S. 1, 5; *NYNEX Corp. v. Discon, Inc.* (1998) 525 U.S. 128, 133 (*NYNEX*) [certain practices "so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances"].)  These "manifestly anticompetitive" practices constitute unreasonable restraints of trade under *any* circumstances, and are thus per se violations of antitrust law. (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 369 (*Chavez*); see *Northern Pac. R. Co. v. United States, supra*, at p. 5.) Modern United States Supreme Court cases caution, however, that these types of practices are few, and the Court has "been slow . . . to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious."  (*FTC v. Indiana Federation of Dentists* (1986) 476 U.S. 447, 458–459, italics omitted.)

When a challenged practice does *not* fall into such a per se category, a court determines whether the practice unreasonably restrains trade by assessing its actual competitive effects under the rule of reason.  (See *Leegin Creative Leather Products, Inc. v. PSKS, Inc.* (2007) 551 U.S. 877, 886–887 (*Leegin*).)  The rule of reason weighs the anticompetitive effects of the conduct in the relevant market against its procompetitive effects, and determines whether, on balance, the practice harms competition.  (See, e.g., *ibid.*; *Exxon, supra,* 51 Cal.App.4th at pp. 1680–1681.)  In engaging in this balancing, "a court may consider 'the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.' "  (*In re Cipro Cases I & II* (2015) 61

Cal.4th 116, 146, quoting *United States v. Topco Associates, Inc.* (1972) 405 U.S. 596, 607 (*Topco*).)

Subjecting conduct to rule of reason scrutiny thus does not reflect a conclusion that the conduct is somehow innocuous or likely to be legal. Practices scrutinized under the rule of reason may hold tremendous potential to harm competition and violate the antitrust laws. (See, e.g., *Leegin supra,* 551 U.S. at p. 894 [acknowledging several "risks of unlawful conduct" resulting from certain restraints reviewed under the rule of reason].) Rather, the defining feature of conduct evaluated under the rule of reason, as opposed to conduct deemed per se illegal, is that, "[n]otwithstanding" those risks, it "cannot be stated with any degree of confidence that [the conduct] 'always or almost always tend[s] to restrict competition and decrease output,' " because the practice "can have either procompetitive or anticompetitive effects, depending upon the circumstances." (*Ibid.*) Thus, further evidentiary investigation into those specific circumstances and relevant market characteristics is necessary in order to determine its competitive effects. Rule of reason balancing serves this purpose.

### B.    Paramount Pictures *Is Not Dispositive*

With this general understanding of the rule of reason and per se antitrust analytical frameworks in mind, we turn to the more specific issue of which should apply to Flagship's non-monopoly circuit-dealing claim.

Our discussion of this issue must begin with *Paramount Pictures, supra*, 334 U.S. 131, the United States Supreme Court's last word on circuit dealing. Although the Court analyzed these claims under the Sherman Act, "federal cases interpreting the Sherman Act are applicable to problems arising under the

21

Cartwright Act." (*Palsson, supra,* 16 Cal.3d at p. 925; see also *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1168 ["Nor can we agree that the Cartwright Act is somehow broader than the Sherman Act and the common law."], superseded by statute on other grounds as stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570.)

*Paramount Pictures* is a 1948 decision arising from the Department of Justice's (DOJ) federal antitrust prosecution of numerous film industry participants, including several movie studios that owned production, distribution, and exhibition (i.e., theater) facilities. (*Paramount Pictures, supra,* 334 U.S. at pp. 140-141.) The action sought to enjoin a long list of the distributors' practices. These practices included certain clearances (*id.* at pp. 145–146), block booking (*id.* at pp. 156–157), franchising agreements (*id.* at p. 155), and, most notably for our purposes, certain types of film licensing agreements between distributors and exhibitors that reflected circuit dealing (*id.* at pp. 153–155). The DOJ's complaint also alleged horizontal and vertical price-fixing conspiracies, through which the defendants set minimum theater admission prices. (*Id.* at p. 142.) The district court concluded that, through these and other practices and agreements, the defendants monopolized and restrained trade in the distribution and exhibition of films nationwide. (*Id.* at pp. 141, 154.)

The Supreme Court affirmed the district court's conclusion that these practices constituted federal antitrust violations. (*Paramount Pictures, supra,* 334 U.S. at pp. 174–175.) With respect to circuit dealing, the Supreme Court explained that the challenged film licensing agreements with theaters were "unlawful restraints of trade in two respects. In the first place, they eliminate the possibility of bidding for films theatre by theatre. In that way they

eliminate the opportunity for the small competitor to obtain the choice first[-]runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." (*Id.* at p. 154.) Second, "the pooling of the purchasing power of an entire circuit in bidding for films is a misuse of monopoly power insofar as it combines the theatres in closed towns with competitive situations." (*Id.* at pp. 154–155.) These two explanations correspond to the two variants of circuit-dealing claims discussed above: non-monopoly circuit-dealing claims and monopoly circuit-dealing claims, respectively. The Supreme Court treated all the film licensing agreements in *Paramount Pictures* as per se illegal under the federal antitrust laws. (See *ibid.*; see also *United States v. Griffith, supra,* 334 U.S. at pp. 108–109 [companion case to *Paramount Pictures* addressing monopoly circuit dealing only].)

*Paramount Pictures* ultimately resulted in a series of consent decrees that effected "a fundamental restructuring of the industry." (*Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687, 694 (*Redwood*); see *Paramount Pictures, supra,* 334 U.S. at p. 179 (dis. opn. of Frankfurter, J.) ["terms of the decree in this litigation amount, in effect, to the formulation of a regime for the future conduct of the movie industry"].) These decrees required, inter alia, that the studios divest themselves of their interests in certain downstream distribution and exhibition operations, and that they license films for exhibition on a "theater by theater" basis, "solely upon the merits and without discrimination in favor of affiliates, old customers, or others." (*Paramount Pictures, supra,* at p. 164, fn. 17.)

In the over 70 years since *Paramount Pictures*, the United States Supreme Court has not revisited the issue of circuit dealing.

23

The California Supreme Court has never addressed the issue. Although *Paramount Pictures* provides crucial guidance on circuit-dealing claims, it is not dispositive here. This is because *Paramount Pictures* addresses circuit dealing in the context of a unique and distinguishable set of market conditions: vertically integrated film distributors who employed a broad range of anticompetitive practices, including horizontal coordination, to maintain their monopoly power over an entire industry. No such broad network of restrictions, nor any horizontal coordination, was even alleged here,[15] and the jury rejected the idea that Century had market power. Nor are modern film studios vertically integrated in any way with the theaters that exhibit their films to the public. "Formerly, the distributors controlled circuits of theatres, and commonly attempted to lessen competition at the exhibitor level by using their vertical leverage through such devices as block booking, direct discrimination against independent exhibitors, joint operation of theatres, and conspiracy to fix prices and establish uniform clearances. The charge of circuit dealing [in *Paramount Pictures*] was colored by this evidence of conspiracy and vertical leverage; not only were some of the circuits controlled by affiliates, but in many instances there was 'cooperation among the major defendants in their respective capacities as distributors and exhibitors.' " (*Redwood, supra*, 200 Cal.App.3d at p. 697, quoting

---

[15] Flagship neither alleged, nor offered any evidence suggesting, that there was a broader hub-and-spoke conspiracy between and among the distributors, or that any of the distributors was vertically integrated with any exhibitor entity. Rather, Flagship's theory involved multiple agreements, each between one distributor and Century, which is neither owned nor controlled by any distributor.

*United States v. Paramount Pictures* (S.D.N.Y. 1946) 66 F.Supp. 323, 346.)

This unique constellation of market conditions and practices presented in *Paramount Pictures* was key to the district court's decision—which, as to the substance of the alleged Sherman Act violations, the high court upheld without caveat. For example, the district court noted that its assessment of the film licensing agreements should be considered "in view of the history and relation to the moving picture business of the various parties to this action." (*United States v. Paramount Pictures, supra,* 66 F.Supp. at p. 346.) And on remand from the Supreme Court's seminal decision, the district court pointed more specifically to the relationship between the defendants, noting that the studio defendants "must be viewed collectively rather than independently as to the power which they exercised . . . over the market *by their theater holdings*." (*United States v. Paramount Pictures* (S.D.N.Y. 1949) 85 F.Supp. 881, 894, italics added.) In this context, the holding in *Paramount Pictures* served a unique purpose: "unravel[ing] the effects of the [film] distributors' past domination of film exhibition." (*Redwood, supra*, 200 Cal.App.3d at p. 697.)

The United States District Court for the Southern District of New York recognized as much in an order, issued during the pendency of the instant appeal, that terminates the consent decrees resulting from *Paramount Pictures*. (See *United States v. Paramount Pictures, Inc.* (S.D.N.Y. Aug. 7, 2020, No. MISC. 19-544 (AT)) 2020 WL 4573069 *1.) The district court did so at the request of the DOJ's antitrust division in connection with the division's "initiative to review, and where appropriate, terminate or modify 'legacy antitrust judgments that no longer protect competition' because of 'changes in industry conditions, changes in

25

economics, changes in law, or for other reasons.' " (*Id.* at pp. *1–*2.) In concluding that terminating the *Paramount Pictures* decrees would be in the public interest, the district court described them as addressing a *horizontal* cartel (*id.* at p. *1), and noted that "[t]he [d]ecrees [have] put an end to [d]efendants' collusion and cartel and, in their absence, the market long-ago reset to competitive conditions. Both the market structure and distribution system that facilitated that collusion are no longer the same." (*Id.* at p. *4.)

In sum, although we must and do follow the Supreme Court's guidance in *Paramount Pictures* regarding competitive concerns associated with circuit dealing—in particular, their potential to stunt growth of small theaters or create barriers to entry for new entrants in the market for film exhibition—we do not read the decision as concluding that all multi-theater license agreements, under all circumstances, are per se illegal under federal (or California) antitrust law. (See *Redwood, supra*, 200 Cal.App.3d at p. 697 [noting *Paramount Pictures* "must be understood in light of its peculiar facts and context" and that "[t]oday, the issues surrounding circuit dealing have acquired a very different industrial context"].)

## C. *Relevant Precedent and Antitrust Legal Principles*

We must therefore look beyond *Paramount Pictures* to determine whether and under what circumstances, if at all, per se treatment might be appropriate for non-monopoly circuit-dealing claims. Below, we consider two primary sources of relevant authority in this regard: (1) general developments in federal and California antitrust law governing vertical restraints since *Paramount Pictures*, and (2) the few cases that address circuit-dealing claims, comprised of a single California Court of Appeal decision and a handful of federal district court decisions.

(See *Palsson, supra*, 16 Cal.3d at p. 925 ["federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act"].)

### 1. *Developments in federal and California antitrust law regarding vertical restraints since* Paramount Pictures

In antitrust law parlance, a film licensing agreement is a "vertical restraint," meaning it is an agreement between entities at "different levels of the market structure"— a film studio supplying film licenses (the supplier level) and a theater exhibiting the studio's films to the public (the retail level). (*Topco, supra,* 405 U.S. at p. 608; see *Tarzana, supra,* 828 F.2d at p. 1399 [concluding clearances are vertical restraints]; *Redwood, supra*, 200 Cal.App.3d at pp. 703–707 [analyzing non-monopoly circuit dealing as a vertical restraint].) Thus, general antitrust law principles regarding vertical restraints are a logical source of guidance on the proper analytical framework for circuit-dealing claims under the Cartwright Act.

The United States Supreme Court's approach to vertical restraints has changed significantly since *Paramount Pictures*. Namely, over the past several decades, the Court has repeatedly held that vertical restraints are to be analyzed under the rule of reason, rather than deemed per se illegal under the Sherman Act. (See, e.g., *Leegin, supra*, 551 U.S. at p. 898 [resale price maintenance]; *NYNEX, supra,* 525 U.S. at p. 130 [vertical boycott agreement]; *Continental T. V., Inc. v. GTE Sylvania Inc.* (1977) 433 U.S. 36, 57–58 (*Sylvania*) [non-price geographic restrictions in franchising agreement].) This approach is a result of the "substantial scholarly and judicial authority supporting [the] economic utility" of vertical restraints in many instances, which

27

"in varying forms, are widely used in our free market economy." (*Sylvania, supra*, at pp. 57–58.)  For example, although vertical restraints plainly restrict intrabrand competition, in doing so they can stimulate interbrand competition—" 'the primary concern of antitrust law' " (*Business Electronics, supra*, 485 U.S. at p. 724; quoting *Sylvania, supra,* 433 U.S. at p. 52, fn. 19)—"by allowing the manufacturer to achieve certain efficiencies in the distribution of [its] products."[16] (*Sylvania, supra,* at p. 54; *Leegin, supra*, at p. 890.)  Vertical restraints can also "allow[ ] the manufacturer to achieve certain efficiencies in the distribution of his products." (*Sylvania, supra*, at p. 54 ["[t]hese 'redeeming virtues' are implicit in every decision sustaining vertical restrictions under the rule of reason"].)  Based on these and other potential procompetitive benefits, the Supreme Court has concluded that one cannot say any particular type of vertical restraint—even vertical restraints regarding price—" ' "always or almost always tend[s] to restrict

---

[16] "The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.  [¶]  The degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer.  Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand competition among the distributors of a product produced by a firm in a highly competitive industry.  But when interbrand competition exists, as it does among television manufacturers, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." (*Sylvania, supra*, 433 U.S. at p. 52, fn. 19.)

competition and decrease output.” ’ ”  (*Business Electronics, supra,* at p. 723; see *Leegin, supra*, at p. 894.)  As such, rule of reason scrutiny is appropriate.

Cases discussing two types of vertical restraints are particularly instructive in analyzing Flagship’s non-monopoly circuit-dealing claims:  vertical boycotts and exclusive dealing. A “vertical boycott” occurs when “ ‘entities at different levels of distribution combine to deny a competitor at one level the benefits enjoyed by the members of the vertical combination.’ ” (*Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 494 (*Marsh*).)  Exclusive dealing occurs when there is an “ ‘agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor.’ ” (*Aerotec International v. Honeywell International* (9th Cir. 2016) 836 F.3d 1171, 1180 (*Aerotec*), quoting *Allied Orthopedic v. Tyco Health Care Group* (9th Cir. 2010) 592 F.3d 991, 996 & fn. 1.)  These two types of vertical restraints are at least partially analogous to Flagship’s non-monopoly circuit-dealing claim, in that Flagship argues Century’s multi-theater licensing agreements caused studios to license first-run films *only* to Century in the relevant geographic market as Flagship defines it (the Rancho Mirage clearance zone). Thus, Flagship’s claim could be understood as implying several vertical group boycotts—that is, agreements between each studio and Century to boycott a competing theater (the Palme). Alternatively, Flagship’s claim could be understood as implying several exclusive dealing arrangements—that is, agreements between each studio and Century that the studio will deal exclusively with Century in the Rancho Mirage clearance zone.

In *NYNEX, supra*, 525 U.S. 128, the Supreme Court applied the rule of reason to a vertical group boycott claim.  Specifically,

29

the Court concluded that an alleged agreement between a supplier and buyer that the buyer would boycott a competing supplier "for an improper reason" was not per se illegal under the Sherman Act. (*Id*. at p. 133.)  The complaint in *NYNEX* alleged that the defendant had monopoly power, that the purpose of the challenged agreement was "to drive [the competing supplier] from the market" (*id*. at p. 137), and that the defendants' conduct increased prices to consumers. (*Id*. at pp. 136–138.)  The Court did not find these allegations sufficient to warrant per se treatment, and expressly rejected the suggestion that any "special motive" of parties to a vertical boycott "could make a significant difference" in this regard. (*Id*. at p. 138.)  Rather, the Court made the broad pronouncement that "antitrust law does not permit the application of the per se rule in the boycott context in the absence of a horizontal agreement."[17] (*Id*. at p. 138.)

Sherman Act challenges to exclusive dealing arrangements are likewise analyzed under the rule of reason.  (*See Jefferson Parish Hospital Dist. No. 2 v. Hyde* (1984) 466 U.S. 29; *id*. at pp. 45-46 (conc. opn. of O'Connor, J.), abrogated on other grounds in *Illinois Tool Works Inc. v. Independent Ink, Inc.* (2006) 547 U.S. 28, 34 [characterizing agreement the majority described as subject to the rule of reason as an exclusive dealing arrangement subject to the rule of reason]; *Aerotec, supra*, 836 F.3d at p. 1180, fn. 2 ["[b]ecause exclusive dealing arrangements provide 'well-recognized

---

[17] Although *NYNEX* acknowledged the possibility that a vertical agreement restricting *price* might warrant per se treatment, the Court has since held that vertical agreements regarding resale prices are also subject to the rule of reason, and for largely the same reasons that non-price vertical restraints are. (See *Leegin, supra*, 551 U.S. at pp. 890–894.)

economic benefits . . . including the enhancement of interbrand competition,' we apply the rule of reason rather than a per se analysis"]; see also, e.g., *Eisai, Inc. v. Sanofi Aventis U.S., LLC* (3d Cir. 2016) 821 F.3d 394, 403 [exclusive dealing arrangements can "offer consumers various economic benefits" and thus are "judged under the rule of reason"].)  Federal courts also apply the rule of reason to exclusive dealing agreements in the movie theater industry specifically—namely, to clearances.  (*See, e.g., Tarzana, supra*, 828 F.2d at p. 1399 [because clearances are vertical restraints, they "are reasonable if they are likely to promote interbrand competition without overly restricting intrabrand competition"]; *Orson, supra,* 79 F.3d at p. 1372.)

The California Supreme Court has not yet addressed the general treatment of vertical restraints under the Cartwright Act, nor has it considered exclusive dealing or vertical group boycott claims more specifically.  But California Courts of Appeal generally analyze vertical restraints under the rule of reason.  (See *Exxon, supra*, 51 Cal.App.4th at p. 1681 [where an antitrust plaintiff alleges vertical restraints, facts must be pleaded showing "some anticompetitive effect in the larger, interbrand market"]; *Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1044 (*Gianelli Distributing*) [same], disapproved of on other grounds by *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384; see also *Theme Promotions v. News America Marketing FSI* (9th Cir. 2008) 546 F.3d 991, 1000 ["California courts have determined that vertical restraints of trade, including exclusive dealing contracts, are not per se unreasonable but instead are subject to a 'rule of reason' analysis"] (italics omitted).)  And our state Courts of Appeal have also more specifically held that, absent some horizontal component or leveraging of monopoly

31

power, neither exclusive dealing arrangements nor vertical group boycotts are per se violations of the Cartwright Act. (See *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 335 (*Fisherman's Wharf*) ["exclusive dealing arrangements are not deemed illegal per se" but rather "tested under a rule of reason"]; *Marsh, supra*, 200 Cal.App.4th at p. 494 [rule of reason applies to "vertical boycott[s]"]; *Gianelli Distributing, supra*, 172 Cal.App.3d at pp. 1045, 1047 [applying rule of reason to vertical agreement between manufacturer and distributor to shift business away from competing distributer]; see also Antitrust, UCL and Privacy Section, Cal. Lawyers Association, Cal. Antitrust and Unfair Competition Law (rev. ed. 2019) § 2.09 ["purely vertical group boycotts are reviewed under the rule of reason"]; *id.*, § 3.08 ["[i]n California, as under federal law, exclusive dealing arrangements are not deemed necessarily illegal per se; rather, they are generally analyzed under the rule of reason"] (fn. omitted).) Rather, a plaintiff alleging such violations must prove net harm to competition under the rule of reason. (See *Fisherman's Wharf, supra,* 114 Cal.App.4th at p. 335; *Marsh, supra*, 200 Cal.App.4th at p. 494.) These decisions apply largely the same logic as the United States Supreme Court decisions discussed above (see, e.g., *Dayton Time Lock Service Inc. v. Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 6 ["Exclusive-dealing contracts are not necessarily invalid. They may provide an incentive for the marketing of new products and a guarantee of quality-control distribution."]; *Gianelli Distributing, supra*, 172 Cal.App.3d at p. 1045, citing *Sylvania, supra*, 433 U.S. at pp. 51–52, 58–59.)

### 2. *California and federal cases addressing circuit dealing since* Paramount Pictures

We turn next to the modern cases that have considered circuit-dealing claims since the *Paramount Pictures* decision and the developments in antitrust jurisprudence outlined above.[18]

#### a. *California circuit-dealing cases*

Only two California decisions have addressed the issue: *Redwood, supra,* 200 Cal.App.3d 687, and this court's decision in *Flagship I, supra,* 198 Cal.App.4th 1366. In *Flagship I*, we did not have occasion to decide which analytical framework to apply to any type of circuit-dealing claims.[19]

---

[18] We do not discuss some of the Sherman Act cases Flagship cites that predate the significant changes in federal antitrust law (and, in some cases, the significant changes in the film industry) outlined in the Discussion *ante*, part I.C.1, and thus are not instructive. (See *Beech Cinema v. Twentieth Century-Fox Film* (2d Cir. 1980) 622 F.2d 1106; *Columbia Pictures Corp. v. Charles Rubenstein, Inc.* (8th Cir. 1961) 289 F.2d 418; *Fox West Coast Theatres Corp. v. Paradise T. Bldg. Corp.* (9th Cir. 1958) 264 F.2d 602; *Bordonaro Bros. Theatres v. Paramount Pictures* (2d Cir. 1949) 176 F.2d 594.) Moreover, none of these cases addresses the correct analytical framework for circuit-dealing claims, but rather various other issues not directly relevant to this appeal, such as the sufficiency of evidence supporting the existence of the conspiracy alleged.

[19] The parties raised this issue in *Flagship I*. (*Flagship I, supra*, 198 Cal.App.4th at p. 1386.) At the time, however, they had not briefed all the legal issues relevant to deciding which antitrust analytical framework applied, and the record was insufficient to determine the exact nature of Flagship's circuit-dealing claims. (*Id.* at pp. 1386–1387.) We noted that "[t]he type of circuit[-]dealing

*Redwood*, by contrast, provides a detailed discussion of the issue, drawing from sources similar to those we survey above. First, the court "acknowledged that the United States Supreme Court held circuit dealing per se unlawful under the Sherman Act but also recognized that both federal antitrust law and the structure of the film industry have undergone considerable development since the late 1940's." (*Flagship I, supra*, 198 Cal.App.4th at p. 1377, citing *Redwood, supra*, 200 Cal.App.3d at pp. 697–698.) The court proceeded to survey antitrust law in several related areas, including boycotts and vertical restraints, as well as the significant changes in the film industry discussed above, noting that "[t]oday, the issues surrounding circuit dealing have acquired a very different industrial context" (*Redwood, supra*, at p. 697), and that, " '[w]ith the elimination of a motion picture industry vertically integrated downward to the exhibitor level, the significance of a distributor's refusal to do business with an independent shifts dramatically.' " (*Id.* at p. 698, quoting *Southway Theatres, Inc. v. Georgia Theatre Co.* (5th Cir. 1982) 672 F.2d 485, 498.) In light of these changed market conditions, the modern antitrust approach to vertical restraints, and the need to understand *Paramount Pictures* "in light of its peculiar facts and context" (*Redwood, supra*, at p. 697), the *Redwood* court ultimately concluded that the plaintiff's non-monopoly circuit-dealing claim was subject to the rule of reason analysis under the Cartwright Act. (*Id.* at p. 713.)

---

claim at issue might influence the analysis of whether the per se rule or the rule of reason should apply," in that it "might make certain authorities or analogies more relevant than others," and declined to decide the issue. (*Ibid.*)

b. *Federal circuit-dealing cases*

Finally, we consider a handful of federal district court cases that have discussed circuit-dealing claims.

Some of these decisions note that *Paramount Pictures* requires per se treatment for all forms of circuit dealing. (See *Cobb Theatres III, LLC v. AMC Entertainment Holdings* (N.D.Ga. 2015) 101 F.Supp.3d 1319, 1342 (*Cobb*); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.* (D.D.C. 2018) 342 F.Supp.3d 126, 132 (*Silver Cinemas*); *Reading International, Inc. v. Oaktree Capital Management LLC* (S.D.N.Y. Jan. 8, 2007, No. CV 03-1895 (PAC)) 2007 WL 39301 *7 (*Reading*).)

Both *Cobb* and *Silver Cinemas* are motion to dismiss decisions in which the relevant antitrust analytical framework was not at issue.[20]  In both cases, the complaint alleged that the defendant theater-circuit owner had leveraged its market power to obtain clearances *and* that it had negotiated clearances for multiple theaters simultaneously.  (See *Silver Cinemas, supra*, 342 F.Supp.3d at pp. 133–135; *Cobb, supra*, 101 F.Supp.3d at p. 1343.)  The complaints in both cases also alleged monopoly power.  (*Silver Cinemas, supra*, at pp. 134–135, 137–138; *Cobb, supra*, at pp. 1335, 1339–1342.)  These decisions concluded that the respective complaints had sufficiently alleged both forms of circuit dealing to avoid dismissal.

---

[20] In *Cobb*, the defendants did argue in their reply brief that the rule of reason, rather than a per se analysis, applied to all circuit-dealing claims, but the court did not address the argument except to note that "[d]efendants suggest that circuit dealing should be scrutinized under the rule of reason.  Even if that were true, the [c]ourt's analysis here would not change." (*Cobb, supra*, 101 F.Supp.3d at p. 1343.)

In *Reading*, the district court granted a summary judgment motion in favor of the defendant on numerous causes of action, and noted that, if the plaintiff was ever attempting to assert any circuit-dealing claims, it had abandoned them. (*Reading, supra*, 2007 WL 39301 at p. *6.) The court then went on to note in dicta that "[e]ven if the [c]ourt liberally construed [p]laintiffs' complaint to include a claim for circuit dealing, [p]laintiffs would not prevail," because "no reasonable jury could find a conspiracy between [the defendant theater] and its distributors." (*Id.* at p. *7.) In this context, the decision notes that "[p]laintiffs are correct that circuit dealing is per se anticompetitive," but does not discuss or rely further on this characterization. (*Ibid.*, italics omitted.) The court goes on to note, somewhat in tension with the implication that all circuit dealing is per se illegal that "*Paramount [Pictures]* merely condemned using these national relationships [between theaters and studios] to leverage master licensing agreements nationwide." (*Id.* at p. *8.)

Still other federal district court cases have applied the rule of reason to what appear in substance to be circuit-dealing claims, citing the general rule that vertical restraints are no longer illegal per se. (See *Cinema Village Cinemart, Inc. v. Regal Entertainment Group* (S.D.N.Y. Sept. 29, 2016, No. CV 15-05488 (RJS)) 2016 WL 5719790 (*Cinema Village*), affd. (2d Cir. 2017) 708 F.Appx. 29; *Six West Retail Acquisition, Inc. v. Sony Picture Theatre Management Corp.* (S.D.N.Y. Mar. 31, 2004, No. Civ. 97-5499) 2004 WL 691680 (*Six West*).) For example, in *Cinema Village*, the court applied the rule of reason to "claims that various film distributors have refused to license first-run films to [plaintiff theater] as a result of exclusive dealing agreements ('clearances') with [defendant theater]" (*Cinema Village, supra*, 2016 WL 5719790 at p. *1), and

that defendant theater had "extracted these agreements from the film distributors, against their economic interests, by using its considerable market power as a major nationwide theater chain." (*Ibid*.) In *Six West*, the court cited *Paramount Pictures* for the proposition that "relationships that eliminate the opportunity for small theatres to obtain first[-]run films stifle competition and violate [s]ection 1 [of the Sherman Act]," and applied the rule of reason to what it termed a "relationship licensing claim," based on a "voluntary relationship between an exhibitor and distributor [that] 'hinder[s] other exhibitors' ability to acquire quality movies.' " (*Six West*, *supra*, 2004 WL 691680 at p. *8.) Neither decision appears to view its application of the rule of reason as in tension with *Paramount Pictures*.

Given the limited extent to which, if at all, these federal district court decisions appear to analyze the question of the appropriate analytical framework for non-monopoly circuit-dealing claims, they do not provide much meaningful guidance, either individually or viewed as a whole, on that issue.

### D. *Flagship's Non-Monopoly Circuit-Dealing Claim Is Subject to the Rule of Reason*

Based on the foregoing survey of relevant federal and California law and film industry developments, we conclude that the trial court correctly required Flagship to show actual net harm to competition under the rule of reason in order to prevail on its non-monopoly circuit-dealing claim. We agree with *Redwood's* thoughtful analysis of the unique legal and industrial context to which the holding in *Paramount Pictures* is tethered. We further agree that the connection between the rule of reason and vertical restraints in modern antitrust law—a connection that, since *Redwood* discussed it, has graduated from a trend to a fundamental

37

tenet—is key to selecting the proper analytical framework for non-monopoly circuit-dealing claims.

The recent federal district court decision terminating the *Paramount Pictures* consent decrees (see *ante*, pp. 26–27), similarly observed that both the industry and federal antitrust law have changed since *Paramount Pictures*, such that many practices deemed per se illegal in the 1940's would not and should not be per se illegal in the modern movie theater industry under modern antitrust law. (*See United States v. Paramount Pictures, Inc., supra,* 2020 WL 4573069 at p. *6 ["[d]ecrees' treatment of certain conduct as per se illegal and subject to criminal penalties . . . prohibits conduct that today may be deemed legal and beneficial to competition and consumers"] (italics omitted).) The order more specifically comments in dicta that circuit-dealing claims are today subject to rule of reason scrutiny: "The legal framework used to evaluate the [d]ecrees' film licensing practices—including block booking, circuit dealing, and resale price maintenance—has also changed. Although per se illegal seventy years ago, today, courts would analyze such restraints under the rule of reason— evaluating the specific market facts to determine whether a practice's anticompetitive harm outweighs its procompetitive benefits." (*Ibid*, italics omitted.)

We note that *Redwood* cabins its holding in a manner suggesting that the rule of reason may not *always* apply to non-monopoly circuit-dealing claims. Specifically, the court noted that there was "no evidence of predatory intent" and no evidence that "the alleged agreements were dictated by the exhibitor, concerned with its own position, rather than granted in the exercise of the distributors' independent discretion . . . reflect[ing] the perceived business advantages to the distributors of dealing with

large theatre circuits." (*Redwood, supra,* 200 Cal.App.3d at p. 703.) With these caveats, the court held that the showing before it "plainly f[ell] short of the evidentiary threshold required to sustain a boycott theory of per se liability." (*Ibid.*) This appears to leave open the possibility that a non-monopoly circuit-dealing claim based on film licensing agreements that have a predatory purpose, are dictated unilaterally by the defendant theater, and/or are beneficial to that theater and not the licensing distributor, might present candidates for per se Cartwright Act liability. Indeed, Flagship argues as much in its attempts to distinguish *Redwood* based on Century's "pressur[ing]" distributors to enter into licensing agreements covering multiple theaters.

We find Flagship's arguments in this regard unpersuasive and, to the extent *Redwood* supports them, we disagree with its holding. *Redwood* "explicitly based its reasoning on federal law and precedents." (*Orchard Supply Hardware v. Home Depot USA, Inc.* (N.D.Cal. 2013) 939 F.Supp.2d 1002, 1011.) But the United States Supreme Court's subsequent decision in *NYNEX* has since "clarified that an unlawful group boycott claim must involve some horizontal arrangement." (*Ibid.* [rejecting, on this basis, plaintiff's reliance on *Redwood* for the proposition that "the Cartwright Act might permit it to allege a group boycott even in the absence of any arrangement between horizontal competitors"]; see *NYNEX, supra*, 525 U.S. at p. 138.) Indeed, the agreement at issue in *NYNEX* had the *sole* purpose of driving a competitor out of the market, yet the Court declined to apply a per se framework on this basis, reserving such treatment solely for boycotts with a horizontal component.[21] (*Ibid*.)

---

[21] For this same reason, in the wake of *NYNEX*, we do not find Flagship's citation to *Movie 1 & 2 v. United Artists*

We are thus unpersuaded by the argument that per se treatment is appropriate where, as here, a theater-circuit owner has not leveraged its monopoly power in obtaining film licenses, but rather, as Flagship asserts the evidence reflects, "pressure[d]" a distributor into a multi-film licensing agreements—even if those agreements primarily or exclusively benefit the theater-circuit owner. The potential procompetitive benefits of an exclusive dealing or group boycott agreement—which California and federal courts have repeatedly recognized—are not negated or prevented when the parties to the vertical agreement have any particular motive.

More broadly, we see nothing *categorically* pernicious about film licensing agreements that cover "two or more theatres in a particular circuit and allow the exhibitor to allocate the film rental paid among the theatres as it sees fit" (*Paramount Pictures, supra*, 334 U.S. at p. 154), such that non-monopoly circuit-dealing claims based thereon warrant per se treatment. Certainly, as the Supreme Court recognized many years ago, such agreements hold the potential to block new market entrants, or stunt the ability of smaller theaters to serve as viable competitive threats to their larger counterparts. (*See ibid*.) These consequences might ultimately harm consumers by increasing prices, reducing product quality, and/or reducing output to an extent that outweighs any

---

*Communications* (9th Cir. 1990) 909 F.2d 1245, to be persuasive authority for the proposition that non-horizontal "group boycotts that directly or indirectly cut off necessary access to customers or suppliers" are per se Sherman Act violations. (*Id.* at p. 1253.) *Movie 1 & 2* is also inapposite in that it involved a boycott with horizontal components. (*Id.* at p. 1248 [distributor defendants alleged to have concertedly refused to deal with plaintiff theater and to have assisted with a split agreement between one distributor defendant and a theater defendant].)

countervailing procompetitive benefits of the agreements. But the fact that such agreements *might* so harm competition does not mean they always will. In *Paramount Pictures*, the certainty of harm to competition was sealed by the vertically integrated relationship between studios and theaters, as well as by the host of other anticompetitive practices these entities employed. The Supreme Court thus deemed per se treatment appropriate. But such certainty no longer exists. Even acknowledging how important first-run films are to theaters, it comports neither with modern antitrust law, nor modern economic and movie theater industry realities, to render all multi-theater licensing agreements per se anticompetitive and illegal.

It is important to note that we are not addressing the appropriate standard for *monopoly* circuit-dealing claims, which require a showing of market power and may be more closely analogized to tying than to exclusive dealing or vertical boycott. We leave that question for another day, as the jury rejected Flagship's monopoly circuit-dealing claim, even under the per se standard the trial court determined should apply thereto.

In sum, we conclude that a Cartwright Act plaintiff asserting a non-monopoly circuit-dealing claim must prove not only that a theater-circuit owner entered into film licensing agreements covering more than one of its theaters, but that such agreements caused net harm to competition, as determined by the balancing of anti and procompetitive effects under the rule of reason. When understood in context, *Paramount Pictures* does not require a contrary conclusion, nor could a contrary conclusion be reconciled with the treatment of vertical restraints—including specifically vertical boycott agreements, exclusive dealing agreements, and clearances—under California and federal antitrust law.

41

## II. SUFFICIENCY OF THE EVIDENCE SUPPORTING JURY'S FINDING OF COMPETITIVE HARM IN THE RELEVANT MARKET

We turn next to Century's arguments that the evidence presented at trial does not sufficiently support Flagship's proposed relevant geographic market (the Rancho Mirage clearance zone) or the jury's finding that the challenged agreements harmed competition in the relevant market.

We review such issues for substantial evidence, meaning we must resolve all conflicts in the evidence in favor of the respondent, and "indulge in" "all legitimate and reasonable inferences . . . to uphold the verdict if possible." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) Under this standard of review, "the power of the appellate court begins and ends with a determination . . . whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Ibid.*; see also *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 ["[s]ubstantial evidence" is " 'such relevant evidence as a reasonable [person] might accept as adequate to support a conclusion' "].)

### A. *Role of Geographic Market Definition Generally*

To assess "direct evidence of anticompetitive effects . . . in the relevant market . . . we must first define the relevant market." (*Ohio v. American Express Co.* (2018) 585 U.S. __ [138 S.Ct. 2274, 2284-2285] (*American Express*).) Thus, under the rule of reason, an antitrust plaintiff must establish the boundaries of the market in which the plaintiff maintains the defendant harmed competition— otherwise, the finder of fact will not know where to look in

42

assessing anti and procompetitive effects of a practice. (See *ibid.* [" '[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition' "], quoting *Walker Inc. v. Food Machinery* (1965) 382 U.S. 172, 177; *see Ralph C. Wilson Industries v. Chronicle Broadcast* (9th Cir. 1986) 794 F.2d 1359, 1363 ["[t]o determine whether competition has been harmed, the relevant market must be defined"].)

"The United States Supreme Court has declared that the relevant market is determined by considering 'commodities reasonably interchangeable by consumers for the same purposes.' (*United States v. du Pont & Co.* (1956) 351 U.S. 377, 395 . . . .) Or, in other words, the relevant market is composed of products that have reasonable interchangeability for the purpose for which they are produced. (*Id.* at p. 404 . . . .)" (*Exxon, supra*, 51 Cal.App.4th at p. 1682.) This concept "encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the ' "area of effective competition" . . . where buyers can turn for alternate sources of supply.' " (*Oltz v. St. Peter's Community Hosp.* (9th Cir. 1988) 861 F.2d 1440, 1446, quoting *Moore v. Jas. H. Matthews & Co.* (9th Cir. 1977) 550 F.2d 1207, 1218.) Thus, sellers offering products consumers would consider substitutes within the geographic area in which those buyers are willing to travel to purchase those products comprises the relevant market because the "groups of sellers or producers" in this area "have actual or potential ability to deprive each other of significant levels of business." (*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.* (9th Cir. 1989) 875 F.2d 1369, 1374 (*Thurman*).)

**B.** *The Jury's Finding Involving Relevant Market*

Century challenges the sufficiency of the evidence to support a finding that the relevant geographic market was as Flagship defined it—that is, the Rancho Mirage clearance zone. But the jury did not make any finding as to what the relevant market was. Although the court relayed to the jury what Century and Flagship's respective proposed definitions of the relevant market were, the verdict form did not ask the jury to identify which (if either) definition the jury accepted. Instead, the verdict form asked the jury to determine a broader issue that involved "the relevant market," but without defining that term. Specifically, the form asked whether "[the defendants'] conduct cause[d] harm to competition in *the relevant geographic and product markets* in the form of increased prices or decreased output of film." (Italics added.)

That the jury answered this question in the affirmative does not necessarily imply that the jury accepted Flagship's definition. The jury could have accepted the definition proffered by the defense, but nevertheless concluded the defendants had caused anticompetitive harm in that more broadly defined market. Therefore, in order to test the sufficiency of the evidence to support the jury's finding of anticompetitive effects in "the geographic and product markets," we must consider whether substantial evidence supports that competition was harmed in *either* the relevant geographic market posited by Flagship (Rancho Mirage) *or* the relevant geographic market posited by Century (the Coachella Valley).

44

### C. Sufficiency of the Evidence to Support a Finding of Competitive Harm in the Geographic Market as Defined by Flagship (the Rancho Mirage Clearance Zone)

#### 1. Flagship's proposed geographic market

Although Century challenges only Flagship's geographic market definition, not its product market definition, the former is a function of the latter. Namely, "[Flagship] claims that the product market is the market for *licensing* of first[-]run films," a market in which distributors sell licenses, theaters buy licenses, and moviegoers do not participate at all.[22] (Italics added.) According to Flagship, because the Palme and The River are located in the Rancho Mirage clearance zone, they only need licenses to play films in that zone, so licenses for other cities would not be viable substitute products for them. Moreover, Flagship argues, The River and the Palme are in a clearance situation in Rancho Mirage, meaning a distributor would only ever license any first-run film to one or the other theater there. Flagship argues that the geographic market is thus the "competitive zone" in which these clearances were granted: the Rancho Mirage clearance zone.

---

[22] The idea that licenses for first-run films are interchangeable products—or, for that matter, that tickets to view first-run films are interchangeable products—is counterintuitive, given that there may be significant differences between any given first-run film and another. In concrete terms, it is hard to understand how the right to exhibit, or the right to view, an R-rated action movie is interchangeable with the right to exhibit or view a G-rated animated film. Given the role of first-run films as a group in the economics of the movie theater business, however, movie theater industry cases appear to have accepted this concept, and the parties do not challenge it here.

To support its geographic market, Flagship points to extensive evidence reflecting industry recognition of the Rancho Mirage clearance zone, and testimony that The River is the only theater with which the Palme competed to obtain film licenses from distributors. For example, it cites testimony of exhibitors and distributors that the Palme and The River were the only theaters that competed *in Rancho Mirage*. Flagship argues evidence of such " ' "commercial realities of the industry" ' " supports its proposed relevant geographic market.

Certainly, ample evidence establishes that only the Palme and The River competed for film licenses in the Rancho Mirage clearance zone, as they were the only two theaters in this zone. But neither this, nor any other evidence Flagship presented at trial suggests that *consumers* in the Rancho Mirage clearance zone could not or would not travel outside of that zone to view a film— for example, at the Regal Rancho or Mary Pickford theaters located approximately 6 miles away from the Palme and approximately 4.5 to 5.5 miles away from The River. (See *ante*, fn. 5, taking judicial notice of distances between theaters.) Indeed, none of the evidence Flagship identifies speaks to substitutability from the perspective of the movie-viewing consumer at all.

This is a crucial point, because the Cartwright Act's purpose is to "protect and promote competition *for the benefit of consumers*" (*Chavez, supra,* 93 Cal.App.4th at p. 375, italics added), and "[c]onsumer welfare is a principal, if not the sole, goal of antitrust laws." (*Cianci v. Superior Court* (1985) 40 Cal.3d 903, 918–919, citing *Palsson, supra*, 16 Cal.3d at p. 935.) The purpose of the rule of reason is likewise consumer-focused. (See *Leegin, supra,* 551 U.S. at p. 886 [goal of rule of reason is to "distinguish[ ] between restraints with anticompetitive effect that are harmful *to*

46

*the consumer* and restraints stimulating competition that are *in the consumer's best interest*"], italics added.) And to the extent the antitrust laws protect competition more broadly, "[c]ompetition is not just rivalry among sellers. It is rivalry for the custom of buyers" (*United States v. Bethlehem Steel Corporation* (S.D.N.Y. 1958) 168 F.Supp. 576, 592), such that " '[a]ny definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.' " (*Westman Com'n Co. v. Hobart Intern., Inc.* (10th Cir. 1986) 796 F.2d 1216, 1221, quoting *United States v. Bethlehem Steel Corporation*, *supra*, at p. 592.) Moreover, any such focus on competition more broadly is merely a means to protect the consumer. (See *Feldman v. Sacramento Bd. of Realtors, Inc.* (1981) 119 Cal.App.3d 739, 748 (*Feldman*) ["the purpose of antitrust laws is primarily to protect the consuming public by healthy competition, and only secondarily to protect the individual competitor"].)

Accordingly, all antitrust movie theater industry cases of which this court is aware have defined the relevant geographic market based on the area in which consumers—that is, moviegoers—are willing to travel to see movies. (See, e.g., *Orson, supra*, 79 F.3d at p. 1372 [summary judgment for defendant inappropriate where evidence potentially supported that challenged clearances caused anticompetitive effects in a market defined by the choices available to "art film consumers in Center City"]; *Cobb, supra*, 101 F.Supp.3d at p. 1336 [relevant geographic market for circuit-dealing claims sufficiently alleged as clearance zone based on moviegoers "not [being] willing to travel outside of the area to watch movies because of significant population density and heavy traffic congestion"]; *Reading, supra*, 2007 WL 39301 at p. *11 [relevant geographic market defined as "the ' "area of effective

47

competition . . . to which the purchaser [here, moviegoers] can practicably turn for supplies" ' "], quoting *United States v. Eastman Kodak Co.* (2d Cir. 1995) 63 F.3d 95, 104.)

"[I]f the purchaser, i.e., the moviegoer, can go beyond the defined market for supplies, i.e., movies, then the geographic market is too narrowly defined." (*Reading, supra,* 2007 WL 39301, at p. *11, italics omitted.)  This focus makes sense when one considers that, whatever is occurring in the distributor-facing portion of the market—that is, the portion in which exhibitors license films from distributors—consumers' choices about where they will go to see a movie are what ultimately determine competing theaters' "actual or potential ability to deprive each other of significant levels of business." (*Thurman, supra,* 875 F.2d at p. 1374.)  Thus, "[f]or antitrust purposes, the proper inquiry is how consumers, not suppliers, view the market" and "the fact that industry professionals consider [Rancho Mirage] a separate zone for licensing purposes . . . has little relevance in the antitrust context." (*Reading, supra,* 2009 WL 39301 at p. *12.)

Therefore, although there may well be a market for film licenses in the Rancho Mirage clearance zone, it is a market of questionable, if any, significance under the antitrust laws. This is particularly true in this case, given that much of the anticompetitive harm Flagship alleges occurred in the relevant market were suffered by movie-going consumers, whose choices and preferences played no role in how Flagship defines the geographic boundaries of its proposed relevant market.

### 2. *Anticompetitive effects in Flagship's proposed geographic market*

Even assuming, arguendo, that Rancho Mirage could serve as a proper antitrust relevant geographic market in this case, Flagship

failed to offer substantial evidence of anticompetitive effects in that market. In arguing to the contrary, Flagship identifies three types of harm in the Rancho Mirage market for film licenses. We address each in turn below.

a. *Reduction in the output of film licenses in the Rancho Mirage clearance zone*

Flagship first argues that the challenged agreements reduced the output of film licenses in the Rancho Mirage clearance zone. Reduction in output is a form of competitive harm recognized by the antitrust laws. (See *American Express, supra,* 585 U.S. at p. __ [138 S.Ct. at p. 2284] ["direct evidence of anticompetitive effects would be ' "proof of actual detrimental effects [on competition]," ' " "such as reduced output, increased prices, or decreased quality in the relevant market"], quoting *FTC v. Indiana Federation of Dentists, supra,* 476 U.S. at p. 460.) Here, however, substantial evidence does not support a finding of reduced output. As discussed above, a clearance zone is a geographic area in which, *by definition*, a distributor will grant only one license to exhibit each first-run film. Thus, in a clearance zone like Rancho Mirage, there will always be only as many film licenses issued as there are first-run films to license. The challenged agreements affect not how many licenses each distributor issues, but how (if at all) the distributor will divide up a static number of licenses between the theaters in the zone.

Flagship did not argue below and does not argue on appeal that the general practice of granting clearances in Rancho Mirage harmed competition.[23] Rather, under Flagship's theory of the case,

_____

[23] Nor do the antitrust laws view this as inherently anticompetitive—rather, in order for a clearance to violate

49

Century used circuit dealing to assure that distributors granted all clearance licenses or at least the most lucrative clearance licenses to The River, rather than, as is the case in many other clearance zones, allocating licenses between the theaters in the zone. As a result, Flagship argues, "distributors decreased their output of film *with respect to the Palme*, denying it access to the vast majority of profitable, first-run, commercial films." (Italics added.) Thus, Flagship's argument identifies a reduction *not* in the *total number of film licenses granted* in Rancho Mirage (which is necessarily capped in a clearance situation), but rather a reduction in the percentage of such licenses *allocated to the Palme*. This is not

the antitrust laws, a plaintiff must show something *beyond* the inherent limitations a clearance places on the number of film licenses granted for a particular film in a particular area. "[T]he reasonableness of a clearance under section 1 of the Sherman Act depends on the competitive stance of the theaters involved and the clearance's effect on competition, especially the interbrand competition." (*Orson, supra*, 79 F.3d at p. 1372; see *Tarzana, supra*, 828 F.2d at p. 1399 [clearances "are reasonable if they are likely to promote interbrand competition without overly restricting intrabrand competition"].) The Ninth Circuit has identified the following factors for the purposes of analyzing the competitive effects of a clearance beyond the inherent limitation on the number of licenses awarded in the clearance zone: (1) "the proximity of the theaters"; (2) "the location of theaters with respect to major thoroughfares"; (3) "whether transportation barriers exist between the theaters"; (4) "whether the plaintiff theater bid on the clearances"; (5) "whether the plaintiff acknowledged that his theater was substantially competitive with the defendant"; (6) "whether the theaters drew customers from the same geographical area"; and (7) "whether the theaters advertised throughout the same geographical area." (*Soffer, supra,* 1996 WL 194947 at p. *4, citing *Tarzana, supra,* 828 F.2d at p. 1399.)

a reduction in overall output that harms competition, but rather a reduction in what one competitor received that harms a single competitor, and does not satisfy a plaintiff's burden under the antitrust rule of reason to show an "actual adverse effect on competition as a whole in the relevant market[.] [T]o prove it has been harmed as an individual competitor will not suffice." (*Capital Imaging v. Mohawk Valley Medical Assoc.* (2d Cir. 1993) 996 F.2d 537, 543 ["Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors. Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the [Sherman] Act because of its too ready availability."]; *see also Southern California Institute of Law v. TCS Educ. System* (C.D.Cal. Apr. 5, 2011, Civ. No. 10-8026 (JAK)) 2011 WL 1296602 *10 ["[s]ection one claimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market"]; *see also RLH Industries, Inc. v. SBC Communications, Inc.* (2005) 133 Cal.App.4th 1277, 1285–1286 [explaining that "the antitrust law is 'concern[ed] with the protection of *competition*, not *competitors*' "], quoting *Brown Shoe Co. v. United States* (1962) 370 U.S. 294, 320.)

Thus, substantial evidence does not support a finding of competitive harm based on a reduction in output in Flagship's proposed relevant market, even if we were to recognize that market for antitrust purposes.

b. *Reduction in consumer choice of theaters in the Rancho Mirage clearance zone*

Flagship next argues that the agreements harmed competition in Rancho Mirage by causing moviegoers there to have fewer theaters from which to choose when they want to view first-run films. But Flagship offered no evidence suggesting consumers cannot or will not travel outside the Rancho Mirage clearance zone to see a movie. As noted above, Flagship defined that area as the relevant market based on where exhibitors buy licenses—not where consumers buy movie tickets. Flagship offered no evidence on the latter point. Thus, no evidence supports this type of harm to consumers in the Rancho Mirage zone. (See *Marsh, supra,* 200 Cal.App.4th at p. 495 [" 'it is plaintiff's burden to make the required showing of a " 'substantially adverse effect on competition in the relevant market' " ' "], quoting *Exxon, supra,* 51 Cal.App.4th at p. 1681.)

Nor would antitrust law necessarily view such an effect as competitive harm, even if substantial evidence did support it. First, the idea that removing one theater from a list of potential options for viewing a film constitutes competitive harm is inconsistent with the approach federal appellate courts take to analyzing clearances. Clearances necessarily deprive consumers of at least one theater choice in which to view a film, yet courts require an antitrust plaintiff challenging a clearance to prove some harm to competition *beyond* that in order for the clearance to violate the antitrust laws. (See *ante*, fn. 23.) Second, at least one court has concluded in the specific context of circuit dealing that "the mere possibility that a consumer might have to see his or her first choice movie at his or her second choice theatre or his or her second choice movie at his or her first choice theatre[ ] is not an

actionable restraint of trade."  (*Six West, supra*, 2004 WL 691680 at p. *10; *see also Reading, supra*, 2007 WL 39301 at pp. *13–*14 [same]; *Cinema Village, supra*, 2016 WL 5719790 at p. *5 [finding that facts asserted "merely establishe[d] that . . . consumers must watch first-run films at one theater rather than at another" but "[w]ithout more, that state of affairs *does not constitute actionable harm*"] (italics added).)  Finally, antitrust law generally does not view the elimination of a particular competitor—without more— as harm to competition.  (See *Austin v. McNamara* (9th Cir. 1992) 979 F.2d 728, 738–739 [The plaintiff "was required to show not merely injury to himself as a competitor, but rather injury to competition.  Even 'the *elimination* of a single competitor, standing alone, does not prove anticompetitive effect.' "]; *Kaplan v. Burroughs Corp.* (1979) 611 F.2d 286, 291 ["[e]ven if sufficient proof of intent and causation are introduced, the elimination of a single competitor, standing alone, does not prove anticompetitive effect"].)  Although many first-run films were not available at the Palme, they were "still . . . available, presumably in whatever number is demanded by consumers," such that the reduction in the number shown at the Palme reflects, "at most, a slight reduction in competition between [the Palme and The River] regarding the [exhibition] of [first-run films]."  (*ECC v. Toshiba America Consumer Products, Inc.* (2d Cir. 1997) 129 F.3d 240, 245.)  "It is settled, however, that to sustain a[n antitrust] claim, a plaintiff 'must . . . show more than just an adverse effect on competition among different sellers of the same product' " (*ibid.*), and instead demonstrate harm to competition in a manner that negatively affects "the consuming public."  (See, e.g., *Feldman, supra,* 119 Cal.App.3d at p. 748.)

Of course, to the extent the elimination of a competitor or harm to a single competitor *also* harms consumers—that is, where the challenged practice has a "deleterious effect both on competitors *and* consumers"—such an effect constitutes competitive harm. (*Palsson, supra*, 16 Cal.3d at p. 937, italics added.) Such was the case, for example, in *Palsson,* which reviewed a county board of realtors' rule excluding part-time real estate salespeople from its membership. (*Id.* at pp. 924–925.) Membership in the board—composed of 75 percent of the active real estate brokers in the county—was the only way to gain access to the multiple listing service (MLS), which was a "practical economic necessity" for real estate salespeople there. (*Id.* at pp. 938 & 924–925.) The challenged board membership rule was a horizontal agreement, but *Palsson* applied the rule of reason in large part because the defendant was a voluntary professional association. (*Id.* at pp. 931–933.) The Court concluded that, by denying the plaintiff (a part-time real estate salesman) MLS access, the defendant board harmed not only the plaintiff (and other part-time brokers likewise excluded), but consumers as well. Namely, by "making it difficult for nonmembers [like plaintiff] to compete effectively with members *[c]onsumer choice is thereby narrowed.* A person wishing to sell or buy a home may believe that a particular nonmember is more competent than available members. But if the consumer wishes to have ready access to a large market in a short period of time, he may be forced to deal with a less desirable member broker or salesman. [¶] . . . In short, the regulations imposed by the board have a deleterious effect both on competitors and consumers." (*Id.* at p. 937, italics added; *see id.* at p. 936 ["[t]he buyer or seller of a home also suffers by the board's practices"].) Under such circumstances, protecting consumers

and the "preservation of competition" in the broader sense also benefited the "scrupulous trader by insuring him a fair opportunity to compete on the market." (*Id.* at p. 935.) The Court went on to recognize that even the elimination of even a small competitor may harm consumers in this manner: "[a]n anticompetitive practice"— that is, one that harms competition and consumers—" 'is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.' " (*Ibid.*, quoting *Klor's, Inc. v. Broadway-Hale Stores, Inc.* (1959) 359 U.S. 207, 213 (*Klor's*).)

Flagship appears to argue that because, under the facts in *Palsson,* the elimination of a single such merchant also harmed consumers, elimination of a single competitor will *always* harm consumers and constitute competitive harm under the rule of reason. But neither *Palsson*, nor any other Cartwright Act case stands for this proposition. Moreover, such an argument ignores the language immediately preceding the portions of *Palsson* Flagship selectively quotes, which recognizes the well-established and fundamental principle that "[a]ntitrust laws are designed primarily to aid the consumer." (*Palsson, supra,* 16 Cal.3d at p. 935.) Indeed, the language in *Palsson* on which Flagship relies for the proposition that the Cartwright Act is unlike the Sherman Act in this regard—*Palsson*'s reference to destruction of a competitor that " 'makes little difference to the economy' "—is quoted from a *Sherman Act* decision. (*Palsson, supra*, 16 Cal.3d at p. 935, quoting *Klor's, supra*, 359 U.S. at p. 213; see *Klor's, supra*, at p. 213 [per se analysis of Sherman Act monopoly claim noting that horizontal group boycott at issue "clearly has, by its 'nature' and 'character,' a 'monopolistic tendency' " and "[a]s such it is not to be tolerated merely because the victim is just one merchant whose

55

business is so small that his destruction makes little difference to the economy"]; see also *Palsson, supra*, at pp. 933–934 [distinguishing *Klor's* in determining rule of reason, not per se analysis, should apply to challenge in *Palsson*].)

c.     *Barriers to entry in the Rancho Mirage clearance zone*

Flagship further implies that the challenged agreements caused harm to competition in that they created barriers for theaters trying to enter or expand operations in the Rancho Mirage clearance zone.  Specifically, citing *Redwood*, Flagship argues that Century's multi-theater licensing agreements "entrench the position of established motion picture exhibitors and pose formidable barriers to entrepreneurs seeking to enter (or expand operations) in the theatre business" (*Redwood, supra,* 200 Cal.App.3d at p. 708), "a competitive harm the antitrust laws seek to prevent."

We do not disagree that such barriers may well result from certain multi-film licensing agreements.  But no evidence in the record supports that this happened here with Century's licensing agreements.  To the contrary, the evidence shows that the Tristone entered the market immediately following the Palme's closure, apparently unaffected by the theoretical barriers Flagship posits.  Nor is there any evidence in the record suggesting that the Tristone has been unable to expand because of barriers created by Century's licensing agreements.

In the absence of evidence suggesting Century's agreements created barriers to entry, Flagship quotes *Redwood* for the proposition that an exhibitor "*may* be placed at a grave competitive disadvantage" and that circuit-dealing agreements "*may* present serious antitrust questions."  (*Redwood, supra*, 200 Cal.App.3d at

56

p. 707, italics added.) Such a theoretical possibility—even one recognized in appellate authority—is not a substitute for evidence of anticompetitive harm. "[T]here is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market." (See *MacDermid Printing Solutions LLC v. Cortron Corp.* (2d Cir. 2016) 833 F.3d 172, 182.) Accepting the mere *potential* for anticompetitive harm as actual harm effectively resurrects the per se standard we rejected above. (See *NYNEX, supra,* 525 U.S. at p. 133 [practices deemed per se illegal "do not require proof that an agreement . . . is, in fact, anticompetitive in the particular circumstances"].) Because non-monopoly circuit dealing is not per se illegal, the mere *possibility* that restricting access to a unique product may, under certain circumstances, have the economic effects Flagship identifies does not, without more, provide substantial evidence to support its non-monopoly circuit-dealing claim.

### D. *Sufficiency of Evidence to Establish Competitive Harm in the Broader Market as Defined by Century (the Coachella Valley)*

#### 1. *Century's proposed geographic market*

Century "contends that the relevant product market is the *exhibition* to consumers of first[-]run films," a market in which exhibitors are the suppliers, and moviegoers are the purchasers. (Italics added.) In defining the geographic bounds of this market, Century therefore focuses on the ability and willingness of moviegoers to travel to theaters in nearby cities in order to see first-run films. Based on this analysis, Century defined the relevant geographic market as the Coachella Valley.

Substantial evidence supports this definition. Numerous percipient witnesses, including the film buyer for the Palme, acknowledged that the Palme and The River competed for customers with at least five theaters in the Coachella Valley. For example, one of the Palme's co-owners testified that, before the La Quinta was built, the Palme "compete[d] for patrons" with five other theaters, and that "the market for patrons in that area consisted" of the Mary Pickford, the Regal Rancho, the Regal in Palm Springs, and the Regal Metro 8 in Indio. Distributors likewise testified that The River and the Palme competed with other theaters for patrons. Uncontested expert testimony also supports such a geographic market. Namely, Century's economic expert testified that it was "reasonable to . . . conclude that all [Coachella Valley theaters] are part of the relevant geographic market," based on the relatively short distances and drive times between The River and other theaters in the Coachella Valley, as well as customer survey responses indicating that 75 percent or more of moviegoers surveyed in each Coachella Valley city considered The River their favorite theater. The Coachella Valley theaters identified above are between approximately 6–10 miles away from the Palme.

Moreover, unlike the market suggested by Flagship, the geographic (and product) market Century proposed to the jury is consistent with the approach to relevant market definition in all other movie theater industry and circuit-dealing cases of which this court is aware. (See *ante*, pp. 49–50.)

### 2. *Anticompetitive effects in Century's proposed geographic market*

Flagship argues that even if the Coachella Valley constitutes the relevant geographic market, substantial evidence still supports

that the challenged multi-theater licensing agreements harmed competition in that broader market.  Specifically, Flagship identifies two types of anticompetitive harm in the Coachella Valley market.  We address each in turn below, and conclude that neither can support the jury's finding.

a.    *Reduction in output of unique films in the Coachella Valley*

First, Flagship points to evidence that the Palme exhibited independent and artistic films not exhibited at any other Coachella Valley theater, and that the Palme's closure, which Flagship attributes to Century's licensing practices, thus reduced the output of such unique films.  Flagship argues that the Palme's closure likewise reduced any competitive pressure to play such films that other theaters may have felt as a result of the Palme playing them.

Even assuming the evidence supports that the Palme closed as a result of the challenged agreements—and we are far from convinced that it does—we are not aware of any evidence speaking to the total number of unique and/or independent films exhibited in the Coachella Valley after the Palme's closure.  There is thus nothing from which a jury could reasonably infer that the total number of unique or independent films exhibited in the Coachella Valley dropped following the Palme's closure.  When asked to identify such evidence during the hearing before this court, Flagship suggested that the record contains testimony establishing that over 700 unique films would not be shown in the Coachella Valley as a result of the Palme's closure.  This misconstrues the testimony.  Century's expert did opine that, during the 13 years the Palme was in business, the Palme exhibited approximately 700 films not exhibited elsewhere in the Coachella Valley.  But he offered no opinion—nor does the record contain any evidence

59

suggesting—that such films did not or could not find a home *after* the Palme's closure.

Indeed, the evidence in the record regarding other theaters' exhibition of independent or unique films supports an opposite conclusion. Namely, there was evidence that at least one theater competed with the Palme for licenses to independent films, as well as evidence that the Tristone, which began showing films immediately after the Palme's closure, played unique and independent films. Specifically, Century's expert economist calculated that more than 37 percent of the first-run films shown at the Tristone in its first 15 months were not exhibited at any other Coachella Valley theater. Although this represents a drop from the 55 percent he calculated for the Palme over the course of its approximately 13-*year* existence, this does not provide a basis from which the jury could reasonably infer that the *overall* number of unique or independent films at *all* Coachella Valley theaters dropped as a result of the Palme's closure. This is because the record does not provide a basis on which the jury could determine the number of unique and/or independent films playing at Coachella Valley theaters other than the Tristone, and, more specifically, whether any Coachella Valley theaters increased the number of unique and/or independent films they offered after the Palme closed. Without such evidence, the jury could not reasonably infer an overall reduction in the output of first-run films or even independent first-run films.

> ### b. *Loss of unique art house theater in the Coachella Valley*

Flagship next argues that the challenged agreements caused a reduction in output of a unique and valuable type of *theater*. Specifically, it argues the Palme's closure denied

60

consumers a "specialty theater with one-of-a-kind features" that offered a "singular combination of upscale amenities and senior-friendly design." Flagship further contends that part of the "special movie-going experience" the Palme offered its patrons were periodic events "convening artists from around the country—including Oscar-winning actors and directors—for Q&A sessions." Like Flagship's argument regarding a posited reduction in unique films following the Palme's closure, this argument fails because, even assuming there is substantial evidence to support an inference that the Palme closed as a result of the challenged agreements, there is no evidence in the record regarding the types of amenities and special events other Coachella Valley theaters offered patrons after the Palme's closure.

Flagship argues that "the standard is whether there was substantial evidence for the jury to conclude that the Palme was a unique art[ ]house theatre in the Coachella Valley." This is incorrect. In order to affirm a finding of competitive harm on this theory, the record must contain substantial evidence that the Palme offered a unique movie-going experience *that, after the Palme closed, was no longer available elsewhere in the Coachella Valley*. But the record does not contain evidence regarding the amenities and/or experience offered at the other theaters in the Coachella Valley after the Palme's closure.

This distinguishes the case at bar from *Cobb, supra,* 101 F.Supp.3d 1319, on which Flagship relies for this point. In *Cobb*, a federal district court concluded that a complaint challenging the use of clearances to prevent movie theaters offering a unique "CinéBistro" experience from entering or effectively competing in the relevant market sufficiently alleged harm to competition, because these effects diminished the quality

61

of theaters offered to consumers. (*Id.* at pp. 1326, 1335.) Specifically, "the [c]omplaint allege[d] in detail . . . the various amenities that [plaintiff's CinéBistro theater] and [the other theaters in the alleged market] respectively offer consumers, often drawing stark differences . . . [and] alleged *more* than a mere substitution of competitors" (*id.* at p. 1335), rather, that "consumers are being forced to purchase a product that is less desirable and of inferior quality." (*Ibid.*) Here, nothing suggests that the Tristone offers—or other Coachella Valley theaters offer— an overall theater experience that is different from, let alone inferior to, that which the Palme had offered in the exact same space as the Tristone just days earlier.

Flagship bore the burden of establishing harm to competition, so to the extent it now argues a reduction in the overall output of independent art house films, or the loss of a unique art house theater reflects such harm, Flagship must identify evidence of those overall losses. Evidence that the Palme was a unique art house theater that offered special events and played many unique films, and that it is now closed, does not satisfy that burden. The jury needed to know what was left after the Palme's closure in order to make the inference Flagship's theory of competitive harm requires.

We therefore conclude that substantial evidence does not support the jury's finding of anticompetitive effects in the relevant market, whether that market is defined as the Rancho Mirage clearance zone or the Coachella Valley. Because, as discussed in detail in the Discussion *ante*, part I, Flagship's non-monopoly circuit-dealing claim was subject to the rule of reason, the lack of substantial evidence to support a finding of anticompetitive harm mandates reversal of the judgment. Because we reverse the

judgment on this basis, we need not reach Century's third and fourth arguments regarding a new trial.

We likewise need not address Flagship's separate appeal challenging the amount of attorney fees awarded below, as Flagship is no longer the prevailing party and thus not entitled to attorney fees.

## DISPOSITION

As to Century Theatres, Inc. and Cinemark USA, Inc.'s appeal (B292609), the judgment in favor of Flagship Theatres of Palm Desert is reversed.  Accordingly, the postjudgment order granting Flagship Theatres of Palm Desert's attorney fees is likewise reversed.  Century Theatres, Inc. and Cinemark USA, Inc. are entitled to recover their costs on appeal in case No. B292609.

As to Flagship Theatres of Palm Desert's appeal (case No. B299014), the appeal is dismissed as moot.  The parties shall bear their own costs on appeal in case No. B299014.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, P. J.

We concur:


BENDIX, J.          SINANIAN, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

63